**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 15 2004**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA
ex rel. JACK J. GRYNBERG,

    Plaintiff - Appellant and
    Cross-Appellee,

  v.

PRAXAIR, INC.,

    Defendant - Appellee and
    Cross-Appellant,

  and

NIELSON & ASSOCIATES, INC.,

    Defendant - Appellee.

---

UNITED STATES OF AMERICA,

    Intervenor.

No. 01-1214 & 01-1242

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 98-D-16)**

---

Edward A. Dauer (Michael S. Porter with him on the briefs), Denver, Colorado,
for Plaintiff - Appellant and Cross-Appellee Jack J. Grynberg.

Mark D. Colley (Craig A. Holman with him on the briefs), of Holland & Knight LLP, Washington, D.C., for Defendant - Appellee and Cross-Appellant Praxair, Inc.

Chris Edwards of Simpson, Keeler & Edwards, LLC, Cody, Wyoming, for Defendant - Appellee Nielson & Associates, Inc.

Robert D. McCallum, Jr., Assistant Attorney General, John W. Suthers, United States Attorney, Douglas Letter, Appellate Litigation Counsel, and Peter R. Maier, Attorney, United States Department of Justice, Washington, D.C., filed a brief on behalf of Intervenor United States.

---

Before **BRISCOE, ANDERSON** and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

Relator Jack J. Grynberg filed a *qui tam* action[1] under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq*., against Defendants Nielson & Associates, Inc. (Nielson) and Praxair, Inc. (Praxair). *See United States ex rel. Grynberg v. Praxair, Inc.*, 207 F.Supp.2d 1163 (D.Colo. 2001). He claimed Defendants knowingly presented or caused to be presented false valuations of royalties owed to the Government for carbon dioxide ($CO_2$) production in violation of 31 U.S.C. §

---

[1]The Latin phrase "*qui tam*" is an abbreviation for "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," meaning, "who as well for the king as for himself sues in this matter." BLACK'S LAW DICTIONARY 1262 (7th ed. 1999). An individual bringing a *qui tam* action on behalf of the Government is known as a "Relator." *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1041 (10th Cir. 2004).

3729(a)(7).[2] He now appeals the district court's grant of summary judgment in favor of Defendants.

## I. PROCEDURAL BACKGROUND

The purpose of the FCA "is to enhance the Government's ability to recover losses sustained as a result of fraud against the Government." S. REP. NO. 99-345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266. A private individual, the Relator, "may bring a civil action for a violation of [31 U.S.C. § 3729] for the person and for the United States Government . . . in the name of the Government." 31 U.S.C. § 3730(b)(1). The Government may elect to intervene and proceed with the action. 31 U.S.C. § 3730(b)(2). If the Government declines to intervene, the Relator may continue the action. 31 U.S.C. § 3730(c)(3). Either way, the Relator receives a share of any Government recovery. 31 U.S.C. § 3730(d). Pursuant to the FCA, Grynberg's Complaint was filed under seal and remained sealed until the United States Department of Justice advised the district court the Government would not intervene. *See* 31 U.S.C. § 3730(b)(2). At that time, the seal was lifted and an

---

[2]Section 3729(a)(7) extends liability to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government . . . ." 31 U.S.C. § 3729 (a)(7). "This subsection has been referred to as the 'reverse false claims provision' of the FCA." *United States ex rel. Aakhus v. Dyncorp, Inc.*, 136 F.3d 676, 681-82 (10th Cir. 1998) (*quoting Rabushka ex rel. United States v. Crane Co.,* 122 F.3d 559, 565 (8th Cir. 1997)). A reverse false claim is documentation resulting in an underpayment to the Government, as opposed to a false claim, generally referring to an inflated or false bill for payment from the Government.

Amended Complaint was served on Nielson and Praxair.

Following discovery, Nielson and Praxair filed separate motions for summary judgment.[3]  The district court granted summary judgment on three different bases, holding: 1) there was no evidence to suggest either Defendant made "knowingly false" statements to the Government; 2) the court lacked subject matter jurisdiction because the *qui tam* action was based on publicly disclosed allegations or transactions; and 3) the claim was barred because it was premised on information known to the Government prior to 1986.  The district court ordered Grynberg to pay Defendants' costs, but left each party to bear its own attorney fees.  Praxair and Nielson sought reconsideration of the district court's apportionment of attorney fees, maintaining that Grynberg's lawsuit was "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment" under  31 U.S.C. § 3730(d)(4).  The district court denied reconsideration.  Grynberg appeals the dismissal of his claim (No. 01-1214) and Praxair cross-appeals the denial of its request for attorney fees and expenses (No. 01-1242).[4]

Grynberg claims the district court erred: (1) by applying an incorrect legal standard in granting the motions for summary judgment; (2) in holding that Praxair and Nielson's candor in their communications with the Government precluded, as a

_____

[3]The district court had previously denied Defendants' separate motions to dismiss the Amended Complaint with prejudice.
[4]Grynberg's Notice of Appeal included several challenges to the district court's rulings on a protective order but he does not argue these issues on appeal.

4

matter of law, a finding that their statements were knowingly false; (3) in holding Grynberg's claim was jurisdictionally barred under the "public disclosure bar"; (4) in applying the pre-1986 law precluding claims based on allegations and transactions within the Government's knowledge; and (5) in concluding Praxair could not be liable because it did not submit royalty statements to the Government.[5]  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's conclusion that Grynberg failed to establish subject matter jurisdiction.  We therefore do not reach the remainder of the issues presented in Grynberg's appeal, No. 01-1214.  However, as to Praxair's cross-appeal, No. 01-1242, we reverse the denial of attorney fees and remand for proceedings consistent with this opinion.

## II.  FACTUAL BACKGROUND

Defendant Nielson, a small, privately held Wyoming corporation, produces and sells oil, hydrocarbon liquids and $CO_2$ from the "McCallum" fields in northern Colorado under leases with the United States Government.  Defendant Praxair owns and operates an industrial plant designed to purify and convert Nielson's raw $CO_2$ into liquid suitable for beverages, food processing and other uses.  The valuation method for $CO_2$ royalties owed to the Government is based on an "Agreement for the

[5]Nielson and Praxair respond to each of these arguments and further propose additional reasons to affirm the district court's judgment, including a challenge to the constitutionality of the FCA if Grynberg's claims are allowed to proceed.  The United States intervened solely to defend the statute's constitutionality.  Because we affirm the district court's decision on jurisdictional grounds, we need not reach the constitutional issues.

5

Sale of Carbon Dioxide" (Agreement) executed in June, 1983 between Conoco, Inc. (Conoco) (who later sold to Nielson) and Praxair's predecessor, Liquid Carbonic Corporation (Liquid Carbonic). The current Agreement between Nielson and Praxair remains unchanged from the 1983 version in all relevant aspects. Grynberg alleges Nielson and Praxair perpetuated Conoco and Liquid Carbonic's practice of submitting reports misstating the valuation of $CO_2$ production, resulting in an underpayment of royalties owed to the Government.

## A.     The 1983 Agreement

The McCallum  leases were originally executed between Conoco and the federal Government for oil production. For many years, Conoco extracted and sold oil from the McCallum production. In 1926, $CO_2$ was discovered during drilling. The raw $CO_2$ gas, produced in conjunction with the oil, was vented to the atmosphere. This practice was known to and approved by the federal regulatory authorities.[6] It changed with the Agreement.

Under the Agreement, Liquid Carbonic would construct a plant to purify the raw $CO_2$ gas produced and delivered by Conoco and convert it into liquid $CO_2$ for food processing, beverages and other uses. Liquid Carbonic would then purchase the finished product based on a price per ton shipped from the plant, a quantity reported by Liquid Carbonic to Conoco each month. The base price per ton under the

---

[6]The venting of $CO_2$ during this period is not challenged in this action.

Agreement was subject to several adjustments, including annual market price fluctuations and monthly adjustments based on the quality of the raw $CO_2$ gas delivered to the plant by Conoco. The Agreement also provided that Liquid Carbonic would return 80% of all vent gases produced from the processing plant so Conoco could reinject the gas. This practice was dependent on Conoco providing the pipeline to permit the return of those gases. Conoco was to pay all royalties on the $CO_2$ delivered to Liquid Carbonic.

In 1994, Nielson purchased the McCallum leases from Conoco and succeeded Conoco as "Seller" under the Agreement. In 1996, Liquid Carbonic merged into Praxair, making Praxair the Agreement's "Buyer." Neither Praxair nor Liquid Carbonic have ever been affiliated with Nielson or Conoco, nor have they been a party to the McCallum leases. There is no allegation or evidence of any conspiracy, side-deal or other arrangement between the defendants.[7]

**B. Government Involvement**

On October 22, 1984, Conoco sent a copy of the Agreement to the Department of the Interior's Minerals Management Service (MMS) and asked for approval of its terms. Conoco explained it would supply the raw $CO_2$ for processing (from the wellhead) and receive payment based on the price of the finished product shipped

---

[7]Although Grynberg unsuccessfully argued to the district court the Agreement was not an arm's-length transaction, he has not raised this argument on appeal.

from Liquid Carbonic's plant (the plant "tailgate.") Conoco also described its plan to return and reinject vent gases into one of its wells but included a schematic showing some gas would be flared.

Forewarned that Conoco was requesting a royalty valuation at Liquid Carbonic's plant tailgate, the MMS wrote to express its concern about the impact on the measurement at the tailgate, as opposed to a larger volume measurement if it were taken at the wellhead. In a letter dated March 14, 1985, the MMS wrote, "if royalty is to be paid on the volume of gas leaving the plant, there could be significant differences, due to plant losses, from the volumes the [wellhead] allocation meters indicate." (R. Vol. II, Tab 19 at 220.) Conoco responded that the plant's vent gas losses would diminish once operations stabilized, but tempered this statement by advising the MMS there would continue to be unavoidable $CO_2$ gas loss due to the quality of the raw $CO_2$ gas and the anticipated plant efficiency. Conoco reiterated its plan to reinject some of the gas and pointed out the Agreement provided a means to sell $CO_2$ reserves, where previously the gas was shut-in or flared.

On April 4, 1985, the MMS informed Conoco "[t]he price reduction provisions are accepted as part of the arm's length contract" and acknowledged the arrangement with Liquid Carbonic "created the only market for $CO_2$ in the area." (R. Vol. II, Tab 21 at 22-27.) Specifically, the MMS noted that the annual variations in price

depended on market prices and recognized the contract provisions allowed "for decreased prices in the event(s) any hydrocarbons . . . exceed[ed] specified levels or if the carbon dioxide content f[e]ll below [a certain percent] of the volume of the gas stream." (*Id.* at 225-226.) However, the MMS directed that royalties must never be based "upon less than the gross proceeds accruing to Conoco from the sale of the $CO_2$." (*Id.* at 224.) It precluded the deduction of processing allowances from the gross proceeds and required royalties be paid on any additional "up-front" payments or tax and/or royalty reimbursements. (*Id.* at 227.) Additionally, the MMS advised Conoco to secure approval of its "production reporting sequence" from the Bureau of Land Management (BLM).[8] (*Id.* at 223.) Despite its plans at the time of the Agreement, Conoco never installed the piping necessary for the return and reinjection of the gas into its well; it was vented.

The venting of the $CO_2$ triggered further scrutiny in November 1985. At that time, the MMS wrote to the BLM to express its concerns regarding the results of an audit of Conoco's $CO_2$ production from the McCallum leases. The MMS informed the BLM that the reporting forms for "the production months October 1984 through August 1985" indicated "the majority of $CO_2$ production [was] being vented." (*Id.*,

---

[8]As the district court noted, "[g]enerally, the MMS is responsible for addressing royalty calculations and payments, while the BLM addresses gas production issues, including the location where the volume is measured for royalty purposes." *See, e.g.*, 30 C.F.R. §§ 206.152; 206.154(a)(1). (R. Vol. V, Tab 118 at 999.)

Tab 22 at 230.)  It requested the BLM provide information addressing Conoco's authority to vent this $CO_2$.  The BLM responded that Conoco's gas venting was approved in April 1980.  Again recognizing that "[u]ntil recently, there ha[d] been no market for $CO_2$ in the McCallum Field area," the BLM stated it did not wish to "refute" the 1980 approval on the basis of the current venting.  (*Id.*, Tab 23 at 243.)

In June 1987, the BLM conducted a "Production Accountability Inspection" of Conoco's McCallum $CO_2$ production.[9]  The inspection included BLM review of the Agreement and its 1985 approval, interviews of several employees to clarify Conoco's procedures and a review of production documentation.  During three separate visits between June and July 1987, BLM representatives inspected Conoco's facilities and were made aware $CO_2$ was either flared during natural gas production or delivered to Liquid Carbonic's plant, while other $CO_2$ was delivered to the plant from $CO_2$ wells.  The BLM also noted Liquid Carbonic vented gas without metering the amount at the vent and there was "shrinkage" (*i.e.,* other gas loss) from Conoco's

---

[9]The BLM annually conducts a Production Accountability Inspection of the production activity for a given month in the McCallum fields.  During these inspections, the BLM requests and receives from Nielson (and previously Conoco) documents reporting the actual wellhead production volumes as distinguished from the plant "tailgate" volumes reported for royalty purposes.  As described by one BLM official, the Production Accountability Inspection is a detailed investigation "to determine whether royalty [is] being reported accurately."  (R. Vol. V, Tab 118 at 1001.)

operations.[10]

In 1988, Conoco requested the BLM approve an additional supply of $CO_2$ to Liquid Carbonic from a South McCallum unit well (the previous activity and approvals all related to wells in the McCallum unit). In response to the BLM's follow-up to the request, Conoco again explained its production procedures, including its practice of venting excess gas. Conoco also reiterated its measurement practices, the volume of vented gas being the difference between volumes produced at the wellhead and volumes measured at the Liquid Carbonic plant tailgate (*i.e.,* volumes sold to Liquid Carbonic). These volumes were reported on a monthly basis to the Colorado Oil & Gas Conservation Commission (COGC).[11] On May 18, 1989, Conoco received BLM's approval. Specifically, the BLM stated the "explanation of measurement and allocation procedures for the production facilities associated with the production of $CO_2$ gas from South McCallum Unit appears appropriate." (*Id.*, Tab 39 at 297.)

In 1992, Liquid Carbonic sought the BLM's permission to construct a dry ice

_____

[10]The estimated shrinkage was questioned during the inspection and the BLM's concern was transmitted to Conoco by letter dated July 27, 1987. The BLM notice stated, "[w]e will keep you informed as our consideration continues." (R. Vol. II, Tab 28 at 265.) There are no further documents referencing this notation and no indication the BLM required Conoco to take any corrective action.

[11]States may contract to audit royalty payments from federal leases within the states pursuant to Section 205 of the Federal Oil and Gas Royalty Management Act of 1982.

manufacturing facility at its plant.[12]  Liquid Carbonic informed the BLM that its

plans included a means whereby the $CO_2$ vapor released from the dry ice machinery

would be piped back into the main $CO_2$ plant.  The plan to recycle the $CO_2$ vapor,

however, was later abandoned as uneconomical.  As was the case with the

unconstructed pipe for the return of $CO_2$ to Conoco's wells, the Government became

aware the vapor from Liquid Carbonic's dry ice plant was vented and not recycled.

Nielson purchased the McCallum and South McCallum leases from Conoco in

1994.  In 1996, the MMS and BLM again inquired about Nielson's royalty

calculation and reporting practices.  In response, Nielson candidly supplied BLM

with all information requested, including a sample of the worksheet used to calculate

the gas value and volume for royalty purposes.  The worksheet identified the

differences between the total wellhead production volumes and the plant tailgate

"sold" volumes reported for royalty purposes (*i.e.,* excluding vented gas volumes)

and the calculation of price.  Nielson also provided two updated schematics,

including a schematic showing the originally anticipated gas reinjection line with the

notation:  "reinjection line by design currently being flared."  (*Id.*, Tab 51 at 366.)

The other schematic, an illustration of Praxair's plant, showed the gas vents

throughout the liquid $CO_2$ production and the dry ice manufacturing facility.

On August 22, 1996, the MMS issued to Conoco and Nielson an "Order to

---

[12]Permission was required because the plant is on land leased from the federal Government.

Comply" pursuant to 30 C.F.R. § 206.154, charging them with having incorrectly reported production and royalties from the South McCallum wells. The order issued "[b]ecause of [the] unauthorized measurement point being at the tailgate of the $CO_2$ plant. . . ." (*Id.*, Tab 57 at 3910.) Nielson appealed the Order to Comply, noting its understanding that $CO_2$ volume measurement at the plant tailgate had been previously approved for the McCallum production in 1985 and the South McCallum production in 1988. A meeting followed between representatives of BLM, Praxair, Nielson, and Conoco. Ed Calvert, representing related companies that were Nielson's partners in the purchase of Conoco's leases, was also present. At the meeting, the BLM confirmed its prior approval of plant tailgate volume measurement with regard to the McCallum unit, but noted approval for the South McCallum unit was not as certain. The Government representatives suggested Nielson seek formal BLM approval for plant tailgate measurement for both McCallum and South McCallum $CO_2$ production, retroactive to November 28, 1988. Nielson complied with the suggestion and the BLM issued its retroactive approval of the off-lease plant tailgate measurement for $CO_2$ production at both units. On November 27, 1996, MMS withdrew its Order to Comply, closed Nielson's appeal and "determined that Nielson & Associates, Inc., are now in regulatory compliance." (R. Vol. III, Tab 61 at 413.)

## C.  Grynberg's Investigation

13

Jack Grynberg is a petroleum engineer who is the president and co-owner of Grynberg Petroleum Company in Denver, Colorado. In late summer or fall of 1997, Grynberg was researching the acquisition of a liquid $CO_2$ supply for use in the recovery of an oil field. [Vol. IV, Tab 104 at 722; Vol. III, Tab 66 at 439]. Because he thought Praxair's prices were high, he telephoned Jim Nielson, Nielson's president. Although the precise conversation is disputed, Grynberg alleges Jim Nielson complained Praxair was taking 30% of the natural $CO_2$ produced and using it as part of its processing operation without payment. This statement motivated Grynberg to conduct an investigation into the situation. As described by Grynberg, the investigation included a subsequent conversation with Jim Williams, Nielson's chief operations officer, regarding the pricing arrangements between Nielson and Praxair. Grynberg also filed a request under the Freedom of Information Act (FOIA) to acquire a copy of the Agreement and other related documents, but his request was denied. Unable to get direct information regarding the Agreement, Grynberg sent an associate to research the records at the COCG office to learn the amount of Neilson's payments for conservation taxes on its $CO_2$ production. In addition, he referred to an industry publication of gas and oil production records. Armed with this information, he calculated Nielson's reported payments received for $CO_2$ and the royalties paid to the Government. He then determined the reasonable market value of the $CO_2$ by making phone calls to end users and interviewing operators of other plants. In the

14

meantime, he directed one of his employees to take photographs of the Praxair plant from the public county roads. That exercise revealed the vents used during operations. His efforts culminated in the conclusion that "the volumes reported on [Nielson's] MMS Forms 2014 and 3160 are fraudulent and do not reflect the actual gas production from the McCallum Fields, as required by MMS regulations." (R. Vol. IV, Tab 104 at 725-26.) Grynberg also credits his investigation for the discovery that the price Praxair paid for the $CO_2$ was intentionally undervalued. Although he concedes the actual numbers reported to the Government throughout the life of the Agreement were accurate, he insists the royalty submissions were knowingly false because Nielson and Praxair intentionally violated federal regulations by failing to pay royalties on wellhead production and by reducing the tailgate price through the deduction of processing costs.

### III.  DISCUSSION

**A.  Grynberg's Appeal, No. 01-1214.**

Grynberg contends the district court applied an improper standard when granting summary judgment. He argues the court incorrectly determined his claims were facially suspect in economic terms and, accordingly, erroneously required him to "demonstrate a particularly compelling case in order to evade summary judgment." (Appellant's Brief at 19-20.) Grynberg's argument is two-pronged. First, he argues the court's "particularly compelling" is a higher standard than announced in

15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

Second, he argues his claim is not economically suspect.

The district court based its statement that Grynberg, because of the particular nature of his claims, would have to show a "particularly compelling case" to avoid summary judgment on *Matsushita*. In *Matsushita*, the Court noted that, given the requirement that, in order to avoid summary judgment, the nonmoving party must present evidence to show a genuine issue of fact, "[i]t follows . . . that if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense— respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." 475 U.S. at 587. The district court's application of the *Matsushita* standard here requires too much of Grynberg. The Court in *Matsushita* was simply noting that, because material issues for trial are required to be "genuine" to survive summary judgment, it was appropriate for the court to look with skepticism at arguments which did not seem to make economic sense, and to require that evidence supporting those arguments be more persuasive. *See id.* This stops short of the district court's "particularly compelling" standard enunciated in the case at hand.

In any event, not all of Grynberg's claims are economically suspect. Certainly, his early claims that Nielson conspired with Praxair to sell $CO_2$ at a price far below market is facially suspect in that it would make little economic sense for Nielson to

16

take such a drastically low price to save a small amount in royalties. However, by the time of summary judgment, Nielson's claims had evolved into an argument that makes economic sense—that Nielson sold $CO_2$ to Praxair at a low price to reflect the fact that Praxair rather than Nielson was bearing the cost of processing and that Nielson was then reporting the lower price and volume for royalty purposes when it should have reported the higher value of the gas at the wellhead.

The district court's statement requiring Nielson to show a "particularly compelling case" was incorrect and, thus, the standard of review applied by the district court was technically improper. However, this error has no effect on our review of the issue as our standard of review is de novo. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Sub. Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). As a result, this court will examine the evidence produced on summary judgment applying the correct standard mandated by Rule 56(c) and come to its own conclusions as to whether summary judgment was proper.

"We review a grant of summary judgment de novo, employing the same legal standard as the district court, specifically Fed.R.Civ.P. 56(c)." *Morgan v. McCotter*, 365 F.3d 882, 887 (10th Cir. 2004). Although the district court granted summary judgment on several legal bases, we must begin with its conclusion that Grynberg failed to meet the jurisdictional requirements of 31 U.S.C. § 3730(e)(4)(A)&(B). "Questions of jurisdiction, of course, should be given priority--since if there is no

jurisdiction there is no authority to sit in judgment of anything else." *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778 (2000); *see also United States v. Ceballos-Martinez*, 371 F.3d 713, 715 (10th Cir. 2004)("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'")(quoting *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998)).

## B.  Subject Matter Jurisdiction

"Satisfaction of the provisions of 31 U.S.C. § 3730(e)(4) is a question of subject matter jurisdiction."  *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1003 (10th Cir. 1996).  The interpretation and application of § 3730(e)(4) is reviewed *de novo*.  *United States ex rel. Precision Co. v. Koch Indus., Inc.,* 971 F.2d 548, 551 (10th Cir. 1992).  Because federal courts are courts of limited jurisdiction, "we presume no jurisdiction exists absent a showing of proof by the party asserting federal jurisdiction."  *Id.*  Therefore, Grynberg "bears 'the burden of alleging facts essential to show jurisdiction under the False Claims Act as well as supporting those allegations by competent proof.'"  *United States ex rel. Holmes v. Consumer Ins. Group,* 318 F.3d 1199, 1202 (10th Cir. 2003) (en banc) (quoting *Advanced Sciences, Inc.*, 99 F.3d at 1004).

Section 3730(e)(4) provides:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a

18

criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)&(B). Grynberg argues the district court erred in its application of § 3730(e)(4) by: (1) holding the transactions on which his claim is based were a matter of "public disclosure" at the time he filed the action; (2) declaring he was not the "original source;" and (3) finding he failed to provide the information to the Government before filing his action.

The jurisdictional inquiry under 31 U.S.C. § 3730(e)(4)(A)&(B) requires a four-step analysis:

(1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act; (3) whether the relator's complaint is "based upon" this public disclosure; and, if so, (4) whether the relator qualifies as an "original source."

*Kennard,* 363 F.3d at 1042 (quotations omitted).[13]  This analytical framework is

_____

[13]Whether a "public disclosure" has occurred is a jurisdictional inquiry arising out of the same statute that creates the cause of action, precipitating an investigation necessarily intertwined with the merits. *Holmes*, 318 F.3d at 1203; *United States ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1518 (10th Cir. 1996); *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). Therefore, the district court correctly resolved this issue when determining the

19

required in all *qui tam* actions and does not hinge on whether the Government is involved in an investigation of the alleged fraud. *Holmes*, 318 F.3d at 1204. "[T]he point of the public disclosure test is to determine whether the qui tam lawsuit is a parasitic one." *Id*. at 1207 nn.6 & 7 (stating that a parasitic law suit occurs when the relator uses information already in the public domain rather than information personally obtained). "A court should address the first three public disclosure issues first. Consideration of the fourth, 'original source' issue is necessary only if the court answers the first three questions in the affirmative." *Kennard*, 363 F.3d at 1042 (quotations omitted). Consequently, we first address whether Grynberg's claim is based on publicly disclosed allegations and transactions from a listed source. If so, we will next consider whether Grynberg is an original source.

### 1) Public Disclosure

The district court held the transaction underpinning Grynberg's allegations, valuation at the tailgate pursuant to the terms of the Agreement, was publicly disclosed twice. The first disclosure occurred when the MMS sent its response to Grynberg's FOIA request. Although it declined to send a copy of the Agreement, it provided a portion of its 1985 letter to Conoco, triggered by Conoco's request for MMS approval of the 1983 Agreement. The response to Grynberg included two pages from the seven-page letter which described the Agreement between Conoco and

---

motions for summary judgment rather than at the time of the motions to dismiss.

20

Liquid Carbonic. The district court found this disclosure revealed both the location at which the royalty would be measured (the tailgate) and how the price would be calculated (a formula based on adjusted fair market values), thus disclosing the basis of allegedly fraudulent transactions. The second public disclosure occurred at the 1996 meeting to discuss the Order to Comply. There, the substance of the administrative investigation was publicly disclosed to Ed Calvert, who the district court found to be previously unconnected with the fraud.[14]

We now turn to the first three steps of our inquiry to determine whether the transaction forming the basis of Grynberg's complaint was publicly disclosed. There is no dispute that the excerpt from the 1985 letter is an administrative report, a source falling squarely within those listed in § 3730(e)(4)(A). But Grynberg maintains the MMS document does not include any allegation, nor does it include the transaction on which he bases his claim. He argues the MMS disclosure of a mere two pages, with the actual figures in the pricing formulas redacted, is only part of the information necessary to describe the transaction. In his view, the disclosure is flawed because it "contains no statement that the royalty volume was determined at the 'tailgate rather than wellhead;' no statement that 'gas valuation [was] based on the contract price rather than higher finished product sales prices;' and no statement of the great

_____

[14]Because we agree the MMS response to Grynberg's request for information was a publicly disclosed transaction, barring his claim unless he is the original source, we need not reach his contention the district court erred in finding Calvert a stranger to the fraud.

21

discrepancy between the contract price and the market price." (Appellant's Opening Br. at 43.) He concludes a fair reading of the disclosed portion of the document, without more, would not raise any suspicions, and therefore, it is insufficient to raise a public disclosure bar to his claim.

Grynberg primarily relies on *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994), to support his position. There, Springfield and its president, David Fink (Relators), were involved in a labor dispute in which the National Mediation Board appointed Dr. Francis X. Quinn as an arbitrator. *Id.* at 647. After reviewing Quinn's pay vouchers, produced during the discovery phase of a prior litigation, Relators realized that, when viewed in conjunction with their involvement in the arbitration proceedings, it appeared Quinn had fraudulently billed the Government for services not actually rendered in connection with the arbitration proceedings. *Id*. at 647-48. After conducting further investigation, including calling numbers found on Quinn's telephone records, Relators unearthed Quinn's fraudulent activity and filed a *qui tam* action. *Id.* at 648. The district court granted Quinn's motion to dismiss the action because it found the suit was based on records publicly disclosed during the prior litigation. *Id.*

The appeals court saw it differently. Although it readily agreed the information was publicly disclosed within the meaning of the FCA, it held the disclosed information did not include an "allegation" or "transaction." *Id*. at 653.

22

The court identified "a distinction between 'allegations or transactions' and ordinary 'information,'" reasoning the common usage of "the term 'allegation' connotes a conclusory statement implying the existence of provable supporting facts" while "[t]he term 'transaction' suggests an exchange between two parties or things that reciprocally affect or influence one another." *Id*. at 653-54. The court continued:

> On the basis of plain meaning, and at the risk of belabored illustration, if $X + Y = Z$, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.,* the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.

*Id*. at 654. Thus, the court concluded the dual purpose of the FCA provision, allowing matters protecting the public fisc to proceed while barring parasitic law suits, is best served by applying a jurisdictional bar "only when enough information exists in the public domain to expose the fraudulent transaction (the combination of X and Y), or the allegation of fraud (Z). When either of these conditions is satisfied, the government itself presumably can bring an action under the FCA and there is no place in the enforcement scheme for *qui tam* suits." *Id*.

We have not adopted the mathematical formula espoused by the D.C. Circuit in *Springfield* and we decline to do so here. But even under *Springfield's* analysis, Grynberg fails to establish jurisdiction. Here, the uncontested evidence, including

23

averments found in Grynberg's several affidavits, conclusively confirms the public domain contained *all* the elemental aspects of the allegedly fraudulent transaction.

It is generally accepted that a response to a request under the FOIA is a public disclosure. *United States v. A.D. Roe Co., Inc.*, 186 F.3d 717, 723-24 (6th Cir. 1999); *United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512, 1519-20 (9th Cir. 1995), *vacated on other grounds,* 520 U.S. 939 (1997); *see also United States ex rel. Reagan v. East Texas Medical Ctr. Reg'l Healthcare Sys.*, 274 F.Supp.2d 824, 845 n.15 (S.D. Tex. 2003) (and cases cited therein). While the information provided to Grynberg redacted the precise numbers, it revealed the existence of the Agreement, the point of production (the wellhead), the liquification of the $CO_2$ through Liquid Carbonic's plant while Conoco still maintained possession of the gas, the purchase point (the tailgate), and the fact the price was adjusted at the tailgate. Grynberg's claim that the document did not state where the royalty would be valued is disingenuous. While the letter does not recite those facts in Grynberg's preferred form, it is written by the entity required to make a valuation judgment and it identifies the purpose of the correspondence is to "approve Conoco's 'production reporting sequence' for carbon dioxide ($CO_2$)" and the attached "Application for the Establishment of Royalty Values." (R. Vol. III, Tab 64 at 427.) Further, the heading on the pages produced identifies the remainder of the document as "Findings and Conclusions on Valuation of $CO_2$." (*Id.* at 428.) In this context, the document

24

identifies the tailgate as the location of pricing and the fact the price will undergo adjustments. The only reasonable conclusion from these statements is that the royalty will be valued at the point of sale, and such location may entail a loss of value in the base amount used for royalty calculations.

Moreover, the information from the COGC, alleged by Grynberg to be the information allowing him to determine pricing, volumes and royalty in the absence of access to the Agreement, was publicly available. Further, the wellhead and tailgate volumes Grynberg relied on to support his claims were provided by a private service that collected, organized and reported the same information submitted by producers to the Government. Clearly, "X" (wellhead as opposed to tailgate volumes) and "Y" (purchase and price adjustment at the tailgate) were within the public domain. Therefore, Grynberg's "additional information, even if nonpublic, cannot suffice to surmount the jurisdictional hurdles." *Springfield Terminal Ry. Co.*, 14 F.3d at 655. All of the material elements of the fraudulent transaction were already in the public domain.

Finding the transaction was publicly disclosed by a listed source, we next consider whether Grynberg's complaint is "based upon" this public disclosure. We apply a "restrictive interpretation of the threshold 'based upon' test [finding such interpretation] consistent with the dual purpose of the [FCA]." *Precision Co.*, 971 F.2d at 552. "Based upon" means "supported by" and the threshold analysis is

25

"intended to be a quick trigger for the more exacting original source analysis." *Id.* (quotations omitted). Even *qui tam* actions only partially based upon publicly disclosed allegations or transactions may be barred. *Id.* The test is whether "substantial identity" exists between the publicly disclosed allegations or transactions and the *qui tam* complaint. *Id.* at 553-54. A comparison of the information in the public domain with the allegations contained in Grynberg's Amended Complaint leaves no question that the information disclosed by the MMS is the basis for his claim.

The crux of Grynberg's complaint is that Nielson and Praxair presented or caused to be presented a reverse false claim when Nielson filed its monthly royalty reports. He alleges the reports submitted are false because value and production are under-reported. The under-reporting is caused by the venting of gas and subsequent valuation at the tailgate, in violation of federal statute and regulation. Indeed, in his disclosure to the Government, Grynberg's total submission of evidence in support of his allegations included the 1985 MMS letter and two memos: one written by Grynberg approximating the operating costs for a $CO_2$ plant in Cortez, Colorado, and another by his employee, comparing the prices at the Cortez plant and those at Praxair. His assumptions deriving from this information do not change the basis for his allegations. Accordingly, Grynberg's complaint is based on a publicly disclosed transaction under 31 U.S.C. § 3730(e)(4)(A), and he may proceed only if he is an

26

original source under 31 U.S.C. § 3730(e)(4)(B).

## 2) Original Source

In the final step of the analysis, we look to § 3730(e)(4)(B), requiring an original source to have "direct and independent knowledge of the information on which the allegations are based" and to have "voluntarily provided the information to the Government" prior to filing suit. "[D]irect knowledge is knowledge gained by the relator's own efforts and not acquired from the labors of others." *Advanced Sciences, Inc.,* 99 F.3d at 1006-07; *see also United States ex rel. Fine v. MK-Ferguson Co.,* 99 F.3d 1538, 1548-49 (10th Cir. 1996) (citing cases). In addition, independent knowledge cannot be "derivative of the information of others, even if those others may qualify as original sources." *Advanced Sciences, Inc.*, 99 F.3d at 1007; *see also MK-Ferguson Co.*, 99 F.3d at 1548-49. The district court determined Grynberg was not an original source, stating:

> [he was] not an insider, did not witness any fraud. Grynberg has not identified a single element of his "investigation" that involved anything other than second hand information, speculation, background information or collateral research (*i.e.* conversations with Nielson officers, conversations with various third parties, telephone calls to Praxair, FOIA requests, research at the COGCC, photographs from a public road, review of oil and gas publications, and speculation regarding what would have been a fair CO2 price), precisely what the Tenth Circuit found insufficient in [*United States ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1162-1163 (10th Cir. 1999)].

27

*Grynberg*, 207 F.Supp.2d at 1185.  Grynberg contends the district court erred in not crediting his discovery of facts essential to his claim in his telephone call with Nielson.  He disputes the district court's characterization of his knowledge as "second hand information," maintaining his knowledge is (1) "direct" because Nielson disclosed to him that Praxair allegedly applied a 30% volume reduction in pricing calculations and (2) "independent" due to his extensive investigation of various sources.  As a result, he concludes he qualifies as an original source.

The burden is on Grynberg to show he is an original source.  *United States ex rel. Stone v. Rockwell Int'l Corp.,* 282 F.3d 787, 800-02 (10th Cir. 2002).  To meet this burden, he must provide more than an "unsupported, conclusory allegation."  *Id.* at 800 (quotations omitted).  Grynberg is required to iterate specific facts demonstrating his direct and independent knowledge is "marked by the absence of an intervening agency . . . [and] unmediated by anything but [his] own labor."  *Kennard*, 363 F.3d at 1044 (quotations omitted).

In *Kennard*, we recently addressed facts somewhat similar to those before us. There, in a *qui tam* action brought by two Relators, Relator Wright was a twenty-five year owner of royalty interests in gas wells on a tract of land near a Tribal reservation.  *Id.* at 1040.  Shortly after the operator of Wright's property sold its lease interests to Comstock, Wright's royalty payments dropped dramatically.  *Id.*  This raised Wright's suspicions that Comstock was underpaying him and others, including

28

the Tribe. *Id.* at 1041. He contacted Relator Kennard and told him of his concerns. *Id.* Kennard proceeded to investigate. *Id.* Through research that included, *inter alia*, reviewing public records, the Relators concluded Comstock knew it was underpaying royalties to the Tribe. *Id.* With the assistance of an attorney, they drafted a *qui tam* complaint which was sent to the Government. *Id.* Their attorney, however, filed another *qui tam* complaint on behalf of the Tribe, based on the same information, one day before Relators filed their *qui tam* suit. *Id.* As a result, the district court dismissed the Relators' complaint for lack of subject matter jurisdiction pursuant to 31 U.S.C. § 3730(e)(4), concluding the basis of their claim was publicly disclosed via the Tribe's lawsuit and the Relators did not qualify as "an original source." *Id.*

On appeal, the Relators alleged their attorney stole their information in preparing the Tribe's *qui tam* action against Comstock, and therefore, the district court erred in applying the jurisdictional bar. We affirmed the information was publicly disclosed under § 3730(e)(4)(A) but reversed the dismissal, holding the Relators were "an original source" under § 3730(e)(4)(B). *Id.* at 1044, 1046.

We rejected Comstock's proposed requirement that Relators must possess knowledge of the "actual alleged fraudulent submissions to the Government" to be an original source. *Id.* at 1044. Knowledge of the precise fraudulent submission to the Government is not necessary. *Id.* "A relator 'need only possess "direct and independent knowledge of the *information on which the allegations are based.*"'" *Id.*

29

(quoting *Stone,* 282 F.3d at 803 and 31 U.S.C. § 3730(e)(4)(B)).  We also declined to create a restriction limiting an original source to only insiders, finding no valid reason to do so.  *Id*. at 1044-45.

Lastly, we refused to "adopt any bright-line rule disqualifying a relator as an original source when the relator examines public records."  *Id*. at 1045.  Rather, we recognized that detailed investigations of fraud on the Government may often require at least some reliance on public information; "[i]t is the character of the relator's discovery and investigation that controls this inquiry."  *Id*.; *Compare United States ex rel. Findley v. FPC-Boron Employees' Club,* 105 F.3d 675, 688 (D.C. Cir. 1997) ("A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed."), *with Springfield Terminal Ry. Co.*, 14 F.3d at 657 ("[Relator] started with innocuous public information [and] completed the equation with information independent of any preexisting public disclosure.").

In concluding Relators qualified as an original source, even though part of their investigation included information in the public domain, we focused on two significant factors.  First, Relator Wright did not refer to, examine, or rely on any public records.  *Kennard*. 363 F.3d at 1046.  Instead, he relied exclusively on his own personal, private royalty records and statements from Comstock and other oil companies in forming his suspicions regarding Comstock's royalty payments.  *Id*.

30

Second, while Relator Kennard did examine public records in the course of his independent investigation, he did more than compile statistics. *Id.* Most importantly to Grynberg's case, Kennard "did not rely on a Government report dealing with the allegations and transactions on which the current *qui tam* action is based because no such document exist[ed]." *Id.* *No public documents disclosed the alleged fraud. Id.* As a result, we held that "Relators ferreted out the alleged fraud in this case and must, therefore, qualify as an original source." *Id.*

Even so, "when a relator's *qui tam* action is based solely on *material elements* already in the public domain, that relator is not an original source." *Id.* at 1045. Unlike the Relators in *Kennard*, Grynberg's knowledge is neither direct nor independent. Grynberg cannot rely on Nielson's alleged disclosure of a 30% reduction of $CO_2$ between entry in the Praxair plant and volume measurement at the tailgate. This knowledge was not direct because he "did not see the fraud with [his] own eyes or obtain [his] knowledge of it through [his] own labor unmediated by anything else . . . ." *United States ex rel. Devlin v. California*, 84 F.3d 358, 361 (9th Cir. 1996). Instead, he derived it secondhand from Nielson, who had firsthand knowledge of the alleged fraud as a result of his employment. *Id.* Grynberg's knowledge also was not independent. Unlike *Kennard*, he relied on a publicly disclosed Government document revealing the transaction forming the basis of his claim—the 1985 MMS letter, and the statistics compiled by an independent service.

31

Moreover, his investigation entailed telephone calls to gather common information, pictures taken from a public road and the review of easily attained records. In this case, Grynberg was not the individual who "ferreted out the alleged fraud." *Kennard*, 363 F.3d at 1046. The same transaction was investigated by the MMS and BLM a year before Grynberg brought his claim.[15]

Consequently, we are led to the ineluctable conclusion that the character of Grynberg's discovery and investigation is insufficient to qualify him as an original source.[16] The district court was correct in concluding it lacked jurisdiction over Grynberg's claim. We affirm.

## C. Praxair's Cross-Appeal, No. 01-1242.

Praxair advances two reasons for reversing the district court's decision releasing Grynberg from liability for Praxair's attorney fees and costs. First, it claims the district court erred as a matter of law when it imposed an unduly rigid standard, measuring the frivolousness of Grynberg's claim only as of the time of his

---

[15]Moreover, the MMS was asked to approve a modified version of the Agreement in 2000 after Grynberg had brought his *qui tam* claim. The only substantial change between the 1983 version and the 2000 version is in the provisions for the expiration of the Agreement. The provisions at issue here remain unchanged. Thus, armed with all Grynberg's allegations and evidence, the MMS approved the modified Agreement on November 3, 2000, specifically addressing both the tailgate measurement and the price adjustment.

[16]Because Grynberg fails to satisfy the "direct and independent knowledge" element of the "original source" analysis, we need not consider whether he "voluntarily provided" this information to the Government as required under § 3730(e)(4)(B). *MK-Ferguson Co.*, 99 F.3d at 1548 n.3.

32

initial complaint. Second, they argue Grynberg's amended complaint was within the parameters of § 3730(d)(4) of the FCA which provides for the award of attorney fees as follows:

> If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

31 U.S.C. § 3730(d)(4). We review the district court's decision to award attorney fees for an abuse of discretion, but review *de novo* the district court's application of the legal principles underlying that decision. *Nat'l Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc.,* 223 F.3d 1143, 1146 (10th Cir. 2000).

The FCA does not define the terms "clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment," but the Act's legislative history suggests that the standard of § 3730(d)(4) is analogous to that used for claims for attorney fees brought under 42 U.S.C. § 1988. S. REP. NO. 99-345, at 29 (1986) ("[The False Claims Act] standard reflects that which is found in [§] 1988 . . . ."), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5294; *see also Pfingston v. Ronan Eng'g Co.,* 284 F.3d 999, 1006 n.4 (9th Cir. 2002); *Mikes v. Straus*, 274 F.3d 687, 705 (2d Cir. 2001).[17] Consequently, our precedent reviewing attorney fees under § 1988 is

_____

[17]Section 1988(b) provides in relevant part:

(b) Attorney's fees

33

instructive.

Prior to engaging in that analysis, however, we must address, *sua sponte*, the district court's authority to award attorney fees when the underlying action has been dismissed for lack of subject matter jurisdiction.

## A.  Jurisdiction to Award Attorney Fees

The Ninth Circuit holds that, in those instances where § 1983 subject matter jurisdiction is lacking, the district court does not have the authority to impose § 1988 attorney fees for two reasons.  *Branson v. Nott,* 62 F.3d 287, 292-93 (9th Cir. 1995). First, citing to precedent from the Eighth and Second Circuits, the court stated:

> By itself, § 1988 does not provide the district court with jurisdiction to grant an attorney fee award where subject matter jurisdiction to hear the underlying § 1983 claim is lacking:  "section 1988 does not by its terms confer subject matter jurisdiction upon federal courts, but rather relies upon the provisions of other federal statutes, such as section 1983 read in conjunction with 28 U.S.C. § 1343 (1988), . . . to confer subject matter jurisdiction."  *Keene Corp. v. Cass,* 908 F.2d 293, 298 (8th Cir. 1990); *see also, W.G. ex rel. D.G. v. Senatore,* 18 F.3d 60, 64 (2d Cir. 1994) (concluding that "fee shifting provisions cannot themselves confer subject matter jurisdiction.");  *Pierre v. Jordan,* 333 F.2d 951, 958 (9th Cir. 1964) (observing that § 1988 does not establish subject matter

> In any action or proceeding to enforce a provision of sections 1981,  1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [20 U.S.C.A. § 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C.A. § 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .

34

jurisdiction), *cert. denied,* 379 U.S. 974, 85 S.Ct. 664, 13 L.Ed.2d 565
(1965). And "[w]here there is no subject matter jurisdiction to proceed
with the substantive claim, as a matter of law '[t]hat lack of jurisdiction
bar[s] an award of attorneys fees under section 1988.'" *Senatore,* 18 F.3d
at 64 (quoting *Keene Corp.,* 908 F.2d at 298). . . .

*Id*. at 293. Second, even assuming jurisdiction to impose § 1988 attorney fees exists,

the court held a defendant is not a "prevailing party" when the dismissal is based on a

lack of subject matter jurisdiction. *Id*. (concluding § 1988 attorney fees only

available to a party who has prevailed on the merits). In

*Citizens for a Better Env't v. Steel Co.,* 230 F.3d 923 (7th Cir. 2000), the Seventh

Circuit reached a different conclusion. Citizens for a Better Environment (CBE)

brought suit against Steel for its failure to timely file reports pursuant to 42 U.S.C. §

11406 (a)(1), authorizing suits against hazardous chemical facilities for a facility's

failure to submit required information. *Id*. at 925. After the Supreme Court

determined CBE lacked standing, on remand Steel requested an award of attorney

fees pursuant to § 11046(f).[18] *Id*. The district court denied Steel's request, reasoning

that if CBE lacked standing to seek civil penalties, Steel must lack standing to seek

attorney fees. *Id*.

---

[18]42 U.S.C. § 11046(f) provides in relevant part:

> The court, in issuing any final order in any action brought
> pursuant to this section, may award costs of litigation (including
> reasonable attorney and expert witness fees) to the prevailing or
> the substantially prevailing party whenever the court determines
> such an award is appropriate. . . .

35

The Seventh Circuit disagreed. The court began its analysis by noting, "[c]ourts that lack jurisdiction with respect to one kind of decision may have it with respect to another. A court, for example, always has jurisdiction to consider its own jurisdiction." *Id*. at 926 (citation and quotations omitted). Thus, the court framed the question as whether an exercise of jurisdiction to award attorney fees in the absence of subject matter jurisdiction over the underlying claim would run afoul of Article III. *Id*. Holding in the negative, the court distinguished between the adjudicatory authority governed by Article III and the legislative authority imposed by Article I. *Id*. at 927. Guided largely by the Supreme Court's decision in *Willy v. Coastal Corp.*, 503 U.S. 131 (1992), the Seventh Circuit acknowledged statutes such as 28 U.S.C. §§ 1919 and 1447(c)[19] specifically "permit awards of litigation expenses in suits that

---

[19]28 U.S.C. § 1919 provides:

> Whenever any action or suit is dismissed in any district court, the Court of International Trade, or the Court of Federal Claims for want of jurisdiction, such court may order the payment of just costs.

28 U.S.C. § 1447(c) provides in relevant part:

> (c) A motion to remand the case [to the state court] on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. . . .

federal courts are not authorized to decide on the merits" and the "[u]se of this fee-shifting power has been uncontroversial." *Id*. at 927. Further, "*Willy* held that attorneys' fees may be awarded under Rule 11 even if the case *never* came within the district court's subject-matter jurisdiction." *Id*. Thus, if the claim for attorney fees is a separate "case or controversy," the federal court may have Article III authority to determine the matter. *Id.* The court then reasoned Steel's claim for attorney fees satisfied these requirements: Steel had suffered an injury that may be redressed by the award of attorney fees. *Id.* at 926. Accordingly, the court concluded, "Article III therefore presents no obstacle to fee-shifting, whether or not the fees were incurred in proceedings that were cases or controversies under Article III." *Id*. at 928.

The Seventh Circuit next considered whether the relevant statutory authority authorized Steel's recoupment of attorney fees. Finding in the affirmative, the court analyzed the language of the statute and found Steel's request to be within its scope—a request for attorney fees in the "final order" resolving an "action brought pursuant to [42 U.S.C. 11046]." *Id*. at 929.

As the final step in its analysis, the Seventh Circuit addressed whether Steel could be deemed the "prevailing party" in the absence of a ruling on the merits of the case. *Id.* at 929-30. The court found "[t]he alternative of limiting 'prevailing' to 'prevailing on the merits' has nothing to recommend it under either the text of the

statute or the considerations that lie behind fee-shifting statutes." *Id*. at 930. Instead, the court applied the "prevailing party" standard imposed on the plaintiffs in *Texas State Teachers Ass'n v. Garland Ind. Sch. Dist.*, 489 U.S. 782, 792-93 (1989). *Id.* at 929. "[A] plaintiff prevails for purposes of 42 U.S.C. § 1988 only if 'at a minimum ... the plaintiff [can] point to a resolution of the dispute which [materially] changes the legal relationship between itself and the defendant.'" *Id.* (quoting *Texas State Teachers Ass'n*, 489 U.S. at 792). Assuming § 11046(f) uses "prevailing party" in the same way, the Seventh Circuit found the dismissal of CBE's lawsuit was a jurisdictional victory that equaled or exceeded a victory on the merits because it secured "a decision foreclosing any private plaintiff from suing about this delay or any other." *Id*. at 929.

We believe the Seventh Circuit takes the most thoughtful approach and will apply its analysis for the purposes of Praxair's request for attorney fees pursuant to 31 U.S.C. § 3730(d)(4). There is no Article III roadblock in this instance.[20] Praxair has expended significant funds in defending this protracted litigation. It claims this injury is the result of a frivolous lawsuit, an alleged injustice which may be redressed by an award of attorney fees as contemplated by the statute. The district court is not

---

[20]We have had but one opportunity to consider the award of attorney fees under 31 U.S.C. § 3730(d)(4). In *MK-Ferguson Co.*, we affirmed the district court's determination that subject matter jurisdiction was lacking as well as its decision to deny the defendant's request for attorney fees. 99 F.3d at 1549. We did not reach the jurisdictional parameters of the district court's authority to rule on attorney fees in that case.

being asked to continue to consider the merits of the underlying *qui tam* case. Rather, it must determine whether Grynberg's lawsuit was or became clearly frivolous or vexatious. Moreover, the result of the district court's summary judgment decision materially changed the legal relationship between Grynberg and Praxair. Grynberg's campaign to declare Praxair an entity "causing" a false claim to be made has reached final resolution. As Grynberg is now prohibited from bringing further claims on these facts, Praxair is a prevailing party.[21] Accordingly, we find subject matter jurisdiction exists to award attorney fees and proceed to review the district court's denial of Praxair's request.

## B. Denial of Attorney Fees

"Under the abuse of discretion standard, the decision of a trial court will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *MK-Ferguson Co.*, 99 F.3d at 1548-49 (citation and quotation marks omitted). When determining whether a plaintiff should be ordered to pay the defendant's attorney fees, we apply the standard enunciated in *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421(1978). Under this standard:

---

[21]In *GHK Exploration Co. v. Tenneco Oil Co.*, applying Oklahoma law, we held the defendant was not the prevailing party because the court dismissed the plaintiff's claim for lack of subject matter jurisdiction rather than on the merits. Our decision here is not constrained by the state law limitations found in *GHK*. 857 F.2d 1388, 1391-92 (10th Cir. 1988).

> [t]he plaintiff's action must be meritless in the sense that it is groundless or without foundation. The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees . . . . [A] plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so. . . .

*Houston v. Norton*, 215 F.3d 1172, 1174 (10th Cir. 2000).[22] "[T]he term 'vexatious' in no way implies that the plaintiff's subjective bad faith is a necessary prerequisite to a fee award against him . . . . [A] district court may in its discretion award attorney's fees to a prevailing defendant . . . upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Christiansburg Garment Co.*, 434 U.S. at 421; *see also Prochaska v. Marcoux*, 632 F.2d 848, 853-54 (10th Cir. 1980).

Praxair claims Grynberg's persistence in this lawsuit was clearly frivolous after it became apparent Praxair had no responsibility or involvement with Conoco's royalty payments. The district court's order denying Praxair's request for attorney fees states:

---

[22]The more stringent test for the recovery of attorney fees by a defendant is based on the distinction between the equitable considerations adhering to the parties. *Christianburg Garment Co.*, 434 U.S. at 418. A prevailing plaintiff is "the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority" and the district court is awarding counsel's fees "against a violator of federal law." *Id.* (quotations omitted). A successful defendant, on the other hand, must demonstrate that the plaintiff has misused his statutory privilege and distorted the intent of the legislation. *Id.* at 419-20.

Section 3730(d)(4) authorizes the award of attorney's fees and expenses "if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for the purposes of harassment." While the claims in this case were properly dismissed on summary judgment, review of the record in this case leaves me unable to find that Relator's Complaint was clearly frivolous, clearly vexatious, or brought primarily for the purposes of harassment.

(R. Supp. App. at 95-96.) Grynberg contends we must assume the district court considered all relevant theories because it set forth the correct standard and referenced its review of the entire record. We disagree. The district court did not hold a hearing on this matter and the truncated order provides no guidance as to whether Praxair's theory was considered.

We recognize that the *Christianburg* standard is "a difficult standard to meet, to the point that rarely will a case be sufficiently frivolous to justify imposing attorney fees on the plaintiff." *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1203 (10th Cir. 2000). However, the Supreme Court has instructed that the district court review the entire course of the litigation in making this determination. *Christiansburg Garment Co.*, 434 U.S. at 421-22. In order to provide meaningful appellate review, we require an articulation of the district court's rationale. *See Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1177 (9th Cir. 1996).

The district court made a specific factual finding that:

There is no evidence indicating any Praxair involvement in royalty calculation, reporting and payment other than providing accurate volume and price data to Nielson pursuant to the Agreement. Praxair has not

41

assisted Nielson in interpreting or implementing the royalty regulations. Nor does Praxair supply any other information or assistance. Praxair does not even receive copies of the royalty reports submitted by Nielson.

*Grynberg*, 207 F.Supp.2d at 1173-74. From these facts the district court rendered its legal conclusion that:

Given that (I) the challenged royalty practices were approved both before and after these representations, (ii) the government knew the extent of venting based on knowledge of both wellhead and tailgate volumes and (iii) the government approved the venting and royalty practices even after learning that ice plant vapors were not being recycled, there is no basis for any inference that these LCC and Praxair statements were made for the purpose of reducing royalty obligations. Moreover, Grynberg argues that wellhead volumes and an alternative $CO_2$ market value should have been used to calculate royalties. The wellhead measurements and the decision of what value to use when calculating royalties were always controlled by Conoco and Nielson. *Praxair was thus totally irrelevant to the royalty underpayments that Grynberg alleges.*

*Id*. at 1186 (emphasis added). Because the timing of Grynberg's discovery of these facts is contrary to a finding that he could reasonably believe his claim against Praxair had a scintilla of merit throughout the litigation, we must remand to the district court for further discussion and findings. *Houston*, 215 F.3d at 1175; *Goichman v. City of Aspen*, 859 F.2d 1466, 1471 (10th Cir. 1988).

## V. CONCLUSION

Grynberg failed to establish subject matter jurisdiction under the FCA to sustain his reverse false claim action. While the district court, nonetheless, maintains subject matter jurisdiction to award attorney fees, the district court failed to provide

42

sufficient information to afford a review of the denial of attorney fees. Accordingly, the dismissal of Grynberg's claim is **AFFIRMED**. The denial of attorney fees is **REVERSED** and the case **REMANDED** for further proceedings consistent with this opinion.