09-1678-cv
Kirk v. Schindler Elevator Corporation

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2009

(Argued: December 10, 2009                    Decided: April 6, 2010)

Docket No. 09-1678-cv

————————

UNITED STATES OF AMERICA ex rel. DANIEL KIRK,

*Plaintiff-Appellant*,

—v.—

SCHINDLER ELEVATOR CORPORATION,

*Defendant-Appellee.*

————————

B e f o r e :

MCLAUGHLIN, KATZMANN, and LYNCH, *Circuit Judges*.

————————

Appeal from a judgment of the United States District Court for the Southern District of

New York (Sidney Stein, *Judge*), entered March 30, 2009, dismissing the Plaintiff-Appellant's

complaint for failure to state a claim upon which relief can be granted and for lack of subject

matter jurisdiction. We hold that a document obtained in response to a request made under the

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, qualifies as an enumerated source

triggering the jurisdictional bar of the False Claims Act ("FCA"), 31 U.S.C. § 3730(e)(4)(A),

only when the document itself is a "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation," and that the documents obtained by the plaintiff through FOIA do not fall within any of these categories.  We further hold that the plaintiff's complaint stated valid claims under the FCA when it alleged that Defendant-Appellee had entered into contracts with the federal government while not in compliance with the Vietnam Era Veterans Readjustment Assistance Act ("VEVRAA"), 38 U.S.C. § 4212, insofar as it (1) had in some years, failed to file certain reports required by VEVRAA, and (2) had in other years, filed false reports.  We therefore vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

_____

JONATHAN A. WILLENS, Jonathan A. Willens LLC, New York, NY, *for Plaintiff-Appellant.*

STEVEN ALAN REISS (Gregory Silbert, David Yolkut, *on the brief*), Weil, Gotshal & Manges LLP, New York, NY, *for Defendant-Appellee*.

CHARLES W. SCARBOROUGH, Appellate Staff (Michael S. Raab, Appellate Staff, *on the brief*), *for* Tony West, Assistant Attorney General, U.S. Department of Justice, Civil Division, Washington, DC; Jeannette Vargas, Assistant United States Attorney, *for* Preet Bharara, United States Attorney, Southern District of New York, New York, New York, *for Amicus Curiae the United States of America*.

KATHERINE Y.K. CHEUNG (Rae T. Vann, *on the brief*), Norris, Tysse, Lampley & Lakis, LLP, Washington, DC, *for Amicus Curiae the Equal Employment Advisory Council*.

_____

KATZMANN, *Circuit Judge*:

The Vietnam Era Veterans Readjustment Assistance Act ("VEVRAA"), 38 U.S.C. § 4212, requires contractors doing business with federal government entities to submit annual

2

reports to the Secretary of Labor providing information about the number of veterans employed by the contractor (the "VETS-100 reports"). Plaintiff-Appellant Daniel Kirk brought this *qui tam* action on behalf of the United States government under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, alleging that his former employer, Defendant-Appellee Schindler Elevator Corp. ("Schindler"), obtained government contracts while representing that it had filed the required VETS-100 reports, when in fact it either had failed to file a report or had filed a false report for the relevant years. Kirk based his allegations in large part on information he obtained after submitting requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

This case calls on us to decide a question of first impression in this Circuit: whether the FCA's jurisdictional bar, 31 U.S.C. § 3730(e)(4)(A), which provides that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in . . . a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation," applies when the plaintiff's allegations are based on materials produced in response to a FOIA request. Our sister Circuits are divided on this issue. If the jurisdictional bar does not apply, this case also presents the question whether Schindler may be held liable under the FCA for (1) failing to file VETS-100 reports, and (2) filing false VETS-100 reports.

We hold that the answer to the question whether a document obtained in response to a FOIA request qualifies as an enumerated source under 31 U.S.C. § 3730(e)(4)(A) depends on the nature of the document itself; the FCA's jurisdictional bar applies only when the document is a "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation." We further hold that Kirk stated valid claims under the FCA when he alleged that

3

(1) Schindler had failed to file VETS-100 reports for certain years, and (2) Schindler had filed false VETS-100 reports for certain years. We vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## BACKGROUND

The FCA is designed to help combat fraud against the federal government by persons who provide goods and services to it. *See United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir. 1992). It establishes liability for persons who submit false claims for payment to the government, 31 U.S.C. § 3729(a)(1), and it contains a variety of measures designed to enhance deterrence and enforcement. These include, for example, a treble damages provision, *id.*, and — central to this case — *qui tam* provisions that allow private citizens who learn of fraud to bring suit in the name of the government and to share in any recovery, *id.* § 3730(b)-(d). Plaintiff-relator Daniel Kirk brought such an action based on his belief that his employer, Schindler, had obtained contracts and payments from the federal government while failing to comply with the requirements of VEVRAA.

Kirk served in the United States Army from 1969 to 1971, performing part of his service in Vietnam. In 1978, he took a job at Millar Elevator Industries, Inc. ("Millar"). Millar was bought by Schindler in 1989, but the two companies operated separately until 2002. In the years preceding 2002, Kirk was promoted several times, eventually (in 2001) becoming Vice President responsible for the Modernization, Repair, and Maintenance Support Departments of Millar. After Schindler integrated Millar's operations into its own in 2002, Kirk was initially named Schindler's Regional Modernization Manager for New York City and Long Island, in which capacity he managed over 100 employees. In July 2003, however, Kirk discovered, apparently

4

without being informed directly, that he was being demoted to the non-managerial position of Field Superintendent. He resigned from Schindler in August 2003.

In April 2004, Kirk filed a complaint with the Office of Federal Contract Compliance Programs ("OFCCP") at the Department of Labor ("DOL"), claiming that he had been improperly demoted and constructively terminated by Schindler despite the fact that he was a Vietnam veteran in violation of VEVRAA. The OFCCP provided Schindler with a copy of Kirk's complaint and began an investigation of Schindler's compliance with VEVRAA. In February 2005, OFCCP found that there was insufficient evidence to support Kirk's claim. Kirk appealed this finding, and in November 2009, the DOL affirmed the OFCCP's finding that Schindler had not violated VEVRAA when it took an adverse employment action against him.

In March 2005, meanwhile, Kirk filed the instant case under the FCA in the name of the U.S. government. As provided for by the FCA, *see* 31 U.S.C. § 3730(b), the case was initially filed under seal; in June 2007, after the government had decided not to intervene, the action was unsealed and Kirk was permitted to pursue it as relator. He then filed the Amended Complaint.

Before turning to the factual allegations in the Amended Complaint, it is useful to review the relevant requirements of VEVRAA. VEVRAA and its accompanying regulations impose several specific requirements on contracts "entered into by any department or agency of the United States for the procurement of personal property and nonpersonal services (including construction)," when the value of the contract exceeds a certain monetary threshold.[1] 38 U.S.C.

---

[1] The monetary threshold at which VEVRAA becomes applicable to a contract has changed several times during the time period relevant to this lawsuit. For contracts signed before November 13, 2001, the minimum amount of a contract subject to VEVRAA was $10,000; for contracts signed on or after November 13, 2001 and before September 28, 2006, the minimum amount was $25,000; and for contracts signed on or after September 28, 2006, the minimum

§ 4212(a)(1). Contracts subject to VEVRAA must contain provisions obligating the contractor (1) to "take affirmative action to employ and advance in employment qualified covered veterans,"[2] 38 U.S.C. § 4212(a)(1); (2) to invite eligible veterans to identify themselves voluntarily to their employer, 48 C.F.R. §§ 22.1310(b), 52.222-37(e); and (3) to submit annual reports to the Secretary of Labor (the "VETS-100 reports") providing data about the qualified covered veterans in the contractor's workforce, including the number of qualified covered veterans in each job category and hiring location and the number of new employees who are qualified covered veterans, 38 U.S.C. § 4212(d); 48 C.F.R. §§ 22.1310(b), 52.222-37(c).

In 1998, Congress passed the Veterans Employment Opportunities Act, 31 U.S.C. § 1354, which provides that "no agency may obligate or expend funds . . . to enter into a contract [covered by VEVRAA] with a contractor from which a [VETS-100] report was required . . . if such contractor did not submit such report," *id.* § 1354(a)(1). In turn, 48 C.F.R. § 52.222-38 provides that "[b]y submission of its offer, the offeror represents that, if it is subject to the

---

amount is $100,000. 66 Fed. Reg. 51,998, 51,998 (Oct. 11, 2001); 71 Fed. Reg. 57,363, 57,369 (Sept. 28, 2006) (amending 48 C.F.R. § 52.222-37).

[2] The term "covered veteran" designates

(i) Disabled veterans.
(ii) Veterans who served on active duty in the Armed Forces during a war or in a campaign or expedition for which a campaign badge has been authorized.
(iii) Veterans who, while serving on active duty in the Armed Forces, participated in a United States military operation for which an Armed Forces service medal was awarded pursuant to Executive Order No. 12985 (61 Fed. Reg. 1209).
(iv) Recently separated veterans.

38 U.S.C. § 4212(a)(3)(A). "The term 'qualified,' with respect to an employment position, means having the ability to perform the essential functions of the position with or without reasonable accommodation for an individual with a disability." *Id.* § 4212(a)(3)(B).

6

reporting requirements [of VEVRAA] . . . it has submitted the most recent VETS-100 Report required by [the Act]." This regulation issued in October 2001 and became effective December 21, 2001. *See* 66 Fed. Reg. 53,487-01, 53,487 (Oct. 22, 2001).

Kirk's Amended Complaint alleges that Schindler, while entering into numerous contracts with the federal government that were subject to the requirements of VEVRAA, failed to comply with it in several salient ways. Because the district court dismissed the complaint under Fed. R. Civ. P. 12(b)(6) and 12(b)(1), we accept as true the material facts alleged in the complaint and draw all reasonable inferences in Kirk's favor. *Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008); *Freedom Holdings, Inc. v. Spitzer*, 363 F.3d 149, 151 (2d Cir. 2004).

Kirk alleges that from 1998 to the present, he was never asked to identify himself as a veteran and that when Schindler integrated its operations with Millar's, the approximately 400 former Millar employees were not given an opportunity to self-identify as veterans. He further alleges that as a manager of 100 employees at Schindler with responsibility for hirings, firings, and promotions, he was never informed of any affirmative action program aiding veterans. A copy of Schindler's employee manual makes no reference to an affirmative action program for veterans.

In addition, Kirk alleges that Schindler failed to submit VETS-100 reports from 1998 until late 2004 and that the reports it did file in 2004, 2005, and 2006 are false. These latter allegations are based in significant part on the results of several FOIA requests submitted to the DOL by his wife, Linda Kirk. In November 2004, Mrs. Kirk submitted a FOIA request seeking copies of any VETS-100 reports filed by Schindler for the years 2002, 2003, or 2004. In a letter dated February 11, 2005, the Office of the Assistant Secretary for Veterans Employment and

Training informed Mrs. Kirk that the DOL had located no VETS-100 reports from 2002 or 2003 and enclosing copies of three VETS-100 reports filed by Schindler in 2004. In January 2005, Mrs. Kirk submitted a second FOIA request seeking copies of any VETS-100 reports filed by Schindler for the years 1998, 1999, 2000, and 2001. By letter dated September 29, 2005, the Office of the Assistant Secretary for Veterans Employment and Training informed her that the DOL had located no VETS-100 reports for 1998, 1999, or 2000, but enclosed copies of 28 VETS-100 reports filed by Schindler for the 12-month period ending September 30, 2002.[3]

Finally, in April 2007, Mrs. Kirk submitted a third FOIA request to the DOL, this time seeking copies of any VETS-100 reports filed by Schindler for the years 2005 and 2006. Under cover of a letter dated May 14, 2007, the Office of the Assistant Secretary for Veterans Employment and Training provided copies of 19 VETS-100 reports filed in 2005 and 49 filed in 2006.

On the basis of these facts, Kirk alleged that Schindler was not in compliance with VEVRAA in that it (1) did not offer its employees the opportunity to identify themselves as

---

[3] The applicable regulations require that VETS-100 reports be filed no later than September 30 of each year, 48 C.F.R. § 52.222-37(c), and that they report on the number of veterans in the employer's workforce in various categories during the 12-month period preceding a date chosen by the employer but falling between July 1 and August 31, *id.* § 52.222-37(d). The parties, and the FOIA responses from the DOL, generally refer to a VETS-100 report "for" a given year, but we note that under the regulations the report filed *in* a given year necessarily covers a 12-month period extending into two calendar years and is not, strictly speaking, the report *for* the year in which it was filed.

This ambiguity makes it unclear whether the September 29, 2005 response to Mrs. Kirk's second FOIA request is complete, in that no mention is made of VETS-100 reports filed in 2001. The reports filed in 2002 do cover some portion of 2001 and in this way are responsive to Mrs. Kirk's request for VETS-100 reports "*for*" 2001. However, the September 29, 2005 letter does not explicitly state that the DOL located no reports filed *in* 2001, and it is conceivable that while such reports did exist, it understood the production of the 2002 reports to satisfy Mrs. Kirk's request. Drawing all reasonable inferences in light of the plaintiff, however, we conclude that the DOL located no reports filed in 2001.

Vietnam-era veterans, (2) failed to implement an affirmative action program aiding covered veterans, and (3) failed to file VETS-100 reports for the years 1998 through 2003, and filed false VETS-100 reports for 2002, 2004, 2005, and 2006. Kirk based his allegation that Schindler did not file VETS-100 reports in 1998-2003 on the responses Mrs. Kirk received to her FOIA requests; with regard to the 2002 reports, Kirk alleged that the fact that these reports were not produced in response to Mrs. Kirk's November 2004 request but were eventually produced in response to her January 2005 request indicates that the 2002 reports were belatedly filed. Kirk also alleged that the 2002 reports were, in any event, false. Kirk's allegation that Schindler's 2002, 2004, 2005, and 2006 VETS-100 reports were false was based on his comparison of the information contained in the reports produced pursuant to Mrs. Kirk's FOIA request with his personal knowledge of Schindler's operations. For example, he alleged that while the 2004 reports cover only eighteen unspecified locations, Schindler has more than eighteen locations in the United States. He also alleged that while the 2004, 2005, and 2006 reports listed no covered veterans who are technicians or craft workers in New York, he personally knows (and named in the complaint) a number of covered veterans working for Schindler in those job categories. Moreover, he alleged, the filed reports must be false because, as his personal experience demonstrated, Schindler never asked Vietnam-era veterans to self-identify.

During the years in which Schindler was not in compliance with VEVRAA, Kirk alleged, it entered into hundreds of contracts with the federal government that were subject to VEVRAA's requirements. Appended to the Amended Complaint are lists of specific contracts between Schindler and various agencies of the U.S. government dating from 1999 to the time the Amended Complaint was filed in 2007, all of which exceed VEVRAA's minimum value. Kirk

9

charged that each claim for payment submitted by Schindler under one of these contracts was a false claim within the terms of the FCA.

In September 2007, Schindler filed a motion to dismiss the Amended Complaint. The three stated grounds for Schindler's motion were (1) that under the jurisdictional provision of the FCA, 31 U.S.C. 3730(e)(4), the district court lacked jurisdiction over Kirk's suit because the information on which his allegations were based — specifically, the information garnered through Mrs. Kirk's FOIA requests — had been publicly disclosed, (2) that Kirk had failed to plead his fraud claims with adequate specificity under Fed. R. Civ. P. 9(b), and (3) that in light of Kirk's pending complaint before the OFCCP, the district court should defer to the agency and dismiss the action under the doctrine of "primary jurisdiction." The district court granted Schindler's motion to dismiss. First, the district court found that there could be no liability for those of Kirk's allegations that were based on Schindler's filing of false or inaccurate VETS-100 reports because Schindler never certified the accuracy of the reports. Second, the district court assessed the applicability of the FCA's jurisdictional bar to Kirk's remaining claims. Recognizing that it faced a question that had not been decided in this Circuit, the district court found that the FOIA reports constituted a "public disclosure" via one of the sources enumerated in 31 U.S.C. § 3730(e)(4)(A). It concluded, accordingly, that it lacked jurisdiction to consider Kirk's claims based on Schindler's failure to file VETS-100 reports because all of the material information on which these claims were based was contained in the DOL's responses to Mrs. Kirk's FOIA requests.

This appeal followed.

**DISCUSSION**

10

While the district court addressed the question of subject matter jurisdiction only after concluding that Kirk's claims with respect to the allegedly false or inaccurate VETS-100 reports were not viable under the FCA, "the first question for an appellate court ordinarily is that of its jurisdiction and the jurisdiction of the lower court in the cause under review." *Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 497 (2d Cir. 2002); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155-56 (2d Cir. 1993) (citing *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)) (stating, in the context of a suit under the FCA, that "[w]here . . . the defendant moves for dismissal under Rule 12(b)(1), . . . as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined" (internal quotation marks omitted)). Accordingly, we first analyze whether the FCA's jurisdictional bar is applicable here.

## I.      Subject Matter Jurisdiction

We review a district court's determination of subject matter jurisdiction *de novo*. *DiTolla v. Doral Dental IPA of N.Y.*, 469 F.3d 271, 275 (2d Cir. 2006).

Title 31, Section 3730(e)(4)(A) of the United States Code provides that

> No court shall have jurisdiction over an action under [the FCA] based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.[4]

---

[4] This provision has recently been amended to specify that in order for the jurisdictional bar to apply, "substantially the same allegations or transactions" must be publicly disclosed in a *federal* criminal, civil, or administrative hearing, a congressional, Government Accountability

11

As we have previously explained, in order for the FCA's jurisdictional bar to apply there must be "public disclosure" of the information on which the allegation of fraud rests, and this "public disclosure" must occur through one of the sources enumerated in the statute. *Doe*, 960 F.2d at 322-23. In addition, the statute indicates that the public disclosure (via an enumerated source) must be of the material elements of the "allegations or transactions" on which the claim is based. 31 U.S.C. § 3730(e)(4)(A); *see United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 736 (7th Cir. 2007) (stating that "[a] 'public disclosure' exists under § 3730(e)(4)(A) when the critical elements exposing the transaction as fraudulent are placed in the public domain" (internal quotation marks omitted)), *overruled on other grounds by Glaser v. Wound Care Consultants*, 570 F.3d 907 (7th Cir. 2009); *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1049-51 (10th Cir. 2004) (finding that "allegations or transactions" have been disclosed when "[a]ll of the material elements of the fraudulent transaction were already in the public domain"); *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994) ("The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain."). If it is established that the allegations or transactions at issue were publicly disclosed through an enumerated source, a *qui tam* plaintiff may avoid dismissal under the jurisdictional bar by establishing that she was an

---

Office, or other *federal* report, hearing, audit, or investigation, or by the news media. Patient Protection and Affordable Care Act, Pub. L. 111-148, § 10104(j)(2), 124 Stat. 119 (2010). Because this amendment was not made retroactive, *see Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. ---, slip op. at 1 n.1 (2010), we do not address the new statutory language here. Throughout this opinion, we will use the present tense to refer to the version of the statute that applies in this case.

"original source" of the relevant information. *Kreindler*, 985 F.2d at 1158-59. The statute defines an "original source" as one who "has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).

Kirk does not concede that the information contained in the responses Mrs. Kirk received to her FOIA requests was "publicly disclosed." However, every circuit to have considered this issue has determined that information produced in response to a FOIA request becomes public once it is received by the requester. *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 55 (1st Cir. 2009); *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 175-76 (5th Cir. 2004); *United States ex rel. Mistick PBT v. Hous. Auth. of Pittsburgh*, 186 F.3d 376, 383 (3d Cir. 1999); *United States ex rel. Burns v. A.D. Roe Co., Inc.*, 186 F.3d 717, 723-24 (6th Cir. 1999); *United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1519-20 (9th Cir. 1995), *vacated on other grounds*, 520 U.S. 939 (1997). Moreover, in the context of construing the term "public disclosure" in the Consumer Product Safety Act, 15 U.S.C. § 2055(b)(1), the Supreme Court has held that the term encompasses materials released in response to a FOIA request. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 109 (1980). Finally, this conclusion is consistent with our own prior discussions of what constitutes a "public disclosure" under the FCA. In *Doe*, we found that once innocent employees of a company being investigated for fraud were informed of the allegations, public disclosure of those allegations had occurred. 960 F.2d at 323. We rejected the contention that, in order for public disclosure to have taken place, the information must be more broadly disseminated. *Id.*

13

*Doe* therefore undermines Kirk's argument that the information contained in the FOIA materials was not public because it had been disclosed only to the Kirks. Accordingly, we find that the information produced to Mrs. Kirk in response to her FOIA requests, once she had received it, was "publicly disclosed" within the meaning of 31 U.S.C. § 3730(e)(4)(B).

However, the question remains whether any or all of the FOIA materials qualify as an enumerated source under the statute. "Section 3730(e)(4)(A) furnishes an exclusive list of the ways in which a public disclosure must occur for the jurisdictional bar to apply." *Id.* Here, the potentially applicable categories are "administrative . . . report . . . or investigation." 31 U.S.C. § 3730(e)(4)(A). Our sister Circuits have come to differing conclusions regarding whether materials produced by a government agency pursuant to a FOIA request are administrative reports or investigations within the meaning of the FCA's jurisdictional bar.

The Third Circuit, in *Mistick*, concluded that they are. Relying largely on dictionary definitions of the terms of the statute, the Third Circuit held that when a relator's claim was based on files released by the Department of Housing and Urban Development ("HUD") in response to a FOIA request, including letters submitted to HUD containing allegedly false claims, the FCA's jurisdictional bar applied. *Mistick*, 186 F.3d at 383-84. After finding that the word "administrative" refers "only to those administrative reports that originate with the federal government," *id.* at 383, the court reasoned,

> [a] "report" is defined as, among other things, "something that gives information" or a "notification," *Webster's Third New International Dictionary* 1925 (1971), and an "official or formal statement of facts or proceeding." *Black's Law Dictionary* 1300 (6th ed. 1990). A response to a FOIA request falls within these definitions. Such a response provides information and notification regarding the results of the agency's search for the requested documents and constitutes an official and formal statement concerning those results.

14

*Id.* at 383-84.  The court continued,

> [w]e also believe that this response occurred "in a[n] . . . administrative . . . investigation."  31 U.S.C. § 3730(e)(4)(A).  For the reasons already explained, HUD's search for the documents sought under the FOIA and its decision to disclose them clearly satisfied our court's interpretation of the term "administrative," and we believe that these processes should be viewed as constituting an "investigation" within the meaning of 31 U.S.C. § 3730(e)(4)(A).  Accepted definitions of the term "investigation" include "a detailed examination," *Webster's Third New International Dictionary* 1189 (1971), and the "making of a search."  1 *The Compact Edition of the Oxford English Dictionary* 457 (1971).  When an agency receives a FOIA request, it is obligated to conduct a search that is reasonably calculated to uncover all relevant documents.

*Id.* at 384.  Accordingly, the *Mistick* court found that jurisdiction was barred by the statute.  *Id.* at 382-84.  *Mistick*'s analysis has since been followed by the First and Fifth Circuits.[5]  *Ondis*, 587 F.3d at 56-57; *Reagan*, 384 F.3d at 175-76.

The Ninth Circuit, in *United States ex rel. Haight v. Catholic Healthcare West*, 445 F.3d 1147 (9th Cir. 2006), took a different approach.  Rather than relying on the dictionary definition of the words "report" and "investigation," the *Haight* court looked at the words in the context of § 3730(e)(4)(A) as a whole.  The court reasoned that

> a FOIA request is a mechanism for duplicating records that are in the possession of the federal government and that are not otherwise excludable from members of the public.  In contrast, reports and investigations generally involve independent work product. "Report" denotes a document that includes an analysis of findings; "investigation" implies independent governmental leg-work.  Moreover, the FCA's jurisdictional bar groups "report" and "investigation" with a series of other enumerated sources that each involve extensive governmental work product and involvement.  Because responding to a FOIA request requires little more than duplication, labeling any response to a FOIA request a "report" or "investigation" would ignore the way in which each of the

---

[5] The Tenth Circuit has also found that a letter from the Department of the Interior Minerals Management Service disclosed pursuant to a FOIA request constituted an administrative report under § 3730(e)(4)(A), although the court's reasoning is not set forth at length because the issue does not appear to have been disputed by the parties.  *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1049 (10th Cir. 2004).  *Grynberg* does not cite *Mistick*.  *See id.*

enumerated sources [in the statute] involves governmental work product.

*Id.* at 1153 (internal quotation marks and citation omitted).

The Ninth Circuit also reviewed the legislative history of the FCA's jurisdictional provisions: The original version of the Act, enacted in 1863, allowed *qui tam* suits with no limitations based on how the relator came to know of the false claim, even if the government was already in possession of the relevant information. *Id.* at 1154. In 1943, in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), the Supreme Court found that a *qui tam* suit was permitted even when the allegations in the complaint were copied directly from a publicly filed criminal indictment. *See Haight*, 445 F.3d at 1154. In response to *Marcus*, Congress enacted a strict jurisdictional provision prohibiting *qui tam* suits "based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time" the case was brought. Pub. L. No. 78-213, 57 Stat. 608, 609 (1943) (superseded 1986); *see also Haight*, 445 F.3d at 1154. Under this provision, even if the relator had obtained the information through independent effort and then submitted it to the government, the fact that the government then possessed the information would bar a *qui tam* action. The high water mark of this restrictive approach was *United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100 (7th Cir. 1984), in which the Seventh Circuit found that the state of Wisconsin was barred from pursuing a *qui tam* action to recover the proceeds of a Medicaid fraud that the state had discovered through its own investigation when Wisconsin had previously, as required by federal law, submitted information concerning the fraud to the U.S. government. *See Haight*, 445 F.3d at 1154. In 1986, Congress again took action, this time to relax the jurisdictional bar, and the current language was instituted. Pub. L. No. 99-562, 100 Stat. 3153, 3157 (1986). Summing up the lesson to be taken from this

16

history, the *Haight* court stated, "the jurisdictional bar provisions must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." 445 F.3d at 1154 (internal quotation marks omitted); *see also Doe*, 960 F.2d at 321-22 (reviewing the same legislative history and concluding that "[t]he 1986 amendments attempt to strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud").

The Ninth Circuit concluded that construing the terms "report" and "investigation" to refer to work product that represents governmental analysis or leg-work rather than the mechanistic production of documents that follows upon a FOIA request is in keeping with the goals of the FCA's jurisdictional provision, as demonstrated by this history:

> Congress sought to bar suits in which the government could already be expected to be on notice of the fraud. . . .
>
> [W]hen responding to a FOIA request, the government need not assimilate the information contained in the requested documents. The duplication of FOIA-requested documents does not require the degree of familiarity and cognizance that the drafting of a report or the conducting of an investigation would. Accordingly, prohibiting *qui tam* relators from basing their allegations on any information obtained in a FOIA response would damage the fraud-detection purpose of the FCA while failing to serve its twin goal of preventing opportunism.

*Haight*, 445 F.3d at 1154-55. The *Haight* court therefore held that the question whether a document obtained through a FOIA request qualifies as one of the enumerated sources under the FCA's jurisdictional bar should be answered by assessing the nature of the document itself. *Id.* at 1156.

If the document obtained via FOIA request is a public disclosure of a "criminal, civil, or

17

administrative hearing, . . . a congressional, administrative, or [General] Accounting Office report, hearing, audit, or investigation, or [is] from the news media," then the jurisdictional bar is applicable. If, as was the case here, the document obtained via FOIA does not *itself* qualify as an enumerated source, its disclosure in response to the FOIA request does not make it so.

*Id.*

After undertaking our own review of the statute and its legislative history, as well as considering the analyses undertaken by our sister Circuits, we agree with the Ninth Circuit that whether a document obtained through a FOIA request is an enumerated source within the meaning of § 3730(e)(4)(A) depends on the nature of the document itself. Our conclusion is compelled, first, by the language of the provision. The specific question we face is whether a document produced in response to a FOIA request is always an "administrative . . . report . . . or investigation." In order to ascertain the import of these potentially broad terms, however, we do not focus on them in isolation; rather, their "meaning[] [is] narrowed by the commonsense canon of *noscitur a sociis* — which counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, ---, 128 S. Ct. 1830, 1839 (2008). All of the other terms in the list of enumerated sources connote the synthesis of information in an investigatory context. "[C]riminal, civil, [and] administrative hearings," for instance, all entail a government inquiry into a given subject, here into an alleged case of fraud. Similarly, government "hearing[s and] audit[s]" are processes by which information is compiled with the concerted aim of deepening a government entity's knowledge of a given subject or, often, determining whether a party is in compliance with applicable law.

Given this company of "neighboring words," we find that it strains the natural meaning of the statute to construe the terms "report" and "investigation" as broadly as some of our sister

18

Circuits have done, so that they include any and all materials produced in response to a FOIA request. In this context, the term "report" most readily bears a narrower meaning than simply "something that gives information." *Ondis*, 587 F.3d at 56 (citing *Webster's Third New Int'l Dict.* 1925 (2002)); *see also Mistick*, 186 F.3d at 383 (finding that a response to a FOIA request is a "report" because it "provides information and notification regarding the results of the agency's search"). Rather, it connotes the compilation or analysis of information with the aim of synthesizing that information in order to serve some end of the government, as in a "hearing" or "audit." It does not naturally extend to cover the mechanistic production of documents in response to a FOIA request made by a member of the public. Similarly, the term "investigation," in the context of the statute, must be construed more narrowly than simply a "detailed examination" or "search." *Mistick*, 186 F.3d at 384. Instead, an "investigation" here implies a more focused and sustained inquiry directed toward a government end — for example, uncovering possible noncompliance or assembling information relevant to a problem of particular concern to the government.[6]

---

[6] In applying the *noscitur a sociis* canon, we have taken guidance from the Supreme Court's decision in *Graham County Soil and Water Conservation District v. United States ex rel. Wilson*, 559 U.S. --- (2010), in which the Court directly addressed the application of this canon to the FCA's jurisdictional bar. Our interpretation follows the Court's counsel that "*all* of the sources listed in §3730(e)(4)(A) provide interpretive guidance," *id.*, slip op. at 8, not merely the immediate neighbors of the term. We also have not used the canon to inject into a word a meaning that would otherwise be wholly absent. *See generally id.*, slip op. at 4-9. Rather, we use it as a guide in sifting through the common understandings of "report" and "investigation" to discover their intended meaning within the FCA. *See Williams*, 128 S. Ct. at 1839 (holding that where terms "are susceptible of multiple and wide-ranging meanings . . . those meanings are narrowed by the commonsense canon of *noscitur a sociis*"); *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("The maxim *noscitur a sociis* . . . is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress."). We likewise have not used the canon to impose commonality on terms that "do not share any . . . core of meaning," *Graham County*, slip op. at 7 n.7. To the contrary, the terms

19

Those of our sister Circuits who have come to the opposite conclusion have emphasized that an agency responding to a FOIA request conducts a review of its records and compiles all responsive documents before providing them to the requester. *See Ondis*, 587 F.3d at 56; *Mistick*, 186 F.3d at 383-84. But what the agency does *not* do in such a case is synthesize the documents or their contents with the aim of itself gleaning any insight or information, as, in contrast, it necessarily would in conducting a "hearing" or "audit." FOIA is simply a mechanism for granting the public access to information in the possession of an agency.[7] *See FBI v. Abramson*, 456 U.S. 615, 641-42 (1982) ("[T]he principal purpose of the FOIA was to establish a general philosophy of full agency disclosure, in order to permit access to official information long shielded unnecessarily from public view . . . ." (internal quotation marks and citation omitted)); *Mistick*, 186 F.3d at 393 (Becker, *C.J.*, dissenting) ("[FOIA] does not compel an agency to 'investigate' a request, in the sense that an agency of the federal government normally investigates such things as allegations of fraud, crimes, or other wrongdoing. Rather, the Act simply forces agencies to 'make [their] records promptly available,' upon request." (citing 5 U.S.C. § 552(a)(3)(A))).

Our reading of the statute is buttressed by the legislative history of § 3730(e)(4)(A). Although, as the Supreme Court recently noted, the legislative history does not indicate the

"hearing," "report," "audit," and "investigation" all refer to processes of uncovering and analyzing information or to the products of those processes. Our interpretation focuses on their shared "core of meaning."

[7] In this connection, we note that FOIA itself nowhere uses the term "report" to describe the end product generated by an agency in response to a request, nor does it use the term "investigation" to describe the process of searching for records. Instead, it describes the process as one of "mak[ing] . . . records promptly available" to a party who has requested them, 5 U.S.C. § 552(a)(3)(A), or "production of . . . agency records," *id.* § 552(a)(4)(B).

20

drafters' reasons for adopting the specific language contained in the final version of the bill, *Graham County Soil and Water Conservation District v. United States ex rel. Wilson*, 559 U.S. ___, slip op. at 14-18 (2010), the history does make clear that the 1986 amendments to the FCA's jurisdictional provision were a reaction against the previous version of the statute, which had barred any *qui tam* action that was based on information in the possession of the government, *id.* at 13; *see also Haight*, 445 F.3d at 1154-55; *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 684 (D.C. Cir. 1997) ("When Congress amended the Act in 1986, . . . the focus of the jurisdictional bar [changed] from evidence of fraud inside the government's overcrowded file cabinets to fraud already exposed in the public domain."). Congress's avowed goal was, generally, to "encourage more private enforcement" of the FCA through expansion of its *qui tam* provisions, S. Rep. No. 99-345*, at 23-24 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5288-89, and, more specifically, to "correct[] restrictive interpretations of the act's . . . *qui tam* jurisdiction," *id.* at 4, *as reprinted in* 1986 U.S.C.C.A.N. at 5269. As the D.C. Circuit noted in *Findley*, the legislators sought "to prod the government into action" by allowing *qui tam* suits when "evidence or information of fraud was buried somewhere in a government file." *Findley*, 105 F.3d at 684 n.4.

What we find most problematic about an interpretation that construes FOIA materials as "administrative reports" or the product of an "administrative investigation" within the meaning of § 3730(e)(4)(A) is that it would essentially resurrect, in a significant subset of cases, the government possession standard that Congress repudiated in 1986. As a practical matter, it is likely that in a substantial number of cases involving fraud against the government, some key piece of information — such as a contract, a record of orders placed, etc. — will be in the

21

government's possession.  Under the approach adopted in *Mistick*, the moment a motivated

individual seeking to uncover fraud receives such a document through FOIA, it becomes a

publicly disclosed "administrative report" or the product of an "administrative investigation,"

triggering the FCA's jurisdictional bar.  Such an individual would then be barred from bringing

an FCA claim when any of the pertinent information is possessed solely in the government's

files, a result that is counterproductive to Congress's goal of "strik[ing] a balance between

encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who

attempt to capitalize on public information without seriously contributing to the disclosure of the

fraud," *Doe*, 960 F.2d at 321.[8]

Certainly, in some cases a *qui tam* plaintiff will herself possess all of the relevant

information, and in such cases the mere fact that some or all of the information was also

possessed by the government would not be a bar to a suit.  Similarly, in some cases a *qui tam*

plaintiff will qualify as an "original source" under 31 U.S.C. § 3730(e)(4)(B), in which case the

jurisdictional bar's exception applies and the status of FOIA documents under the provision

---

[8] At oral argument, counsel for Schindler noted, in addressing whether a finding that FOIA materials are an enumerated source under the statute would reinstate the government possession standard, that not all information in the government's possession is subject to disclosure under FOIA.  We see no reason of logic or policy, however, why the presence or absence of jurisdiction in a suit under the FCA should turn on the question of whether one of the exceptions to FOIA applies.  *See* 5 U.S.C. § 552(b) (providing that FOIA does not apply to classified information, information relating to the internal personnel rules and practices of an agency, information specifically exempted from disclosure by statute, trade secrets, inter- or intra-agency memoranda, personnel and medical files, certain law enforcement records, certain reports of financial regulatory agencies, or geological and geophysical information concerning wells).  Moreover, it makes little sense to find that a party is able to bring a suit because the information he attempted to obtain from the government was not subject to disclosure under FOIA when that party will, in such a case, necessarily not have in her possession all of the information she requires to bring her lawsuit.

becomes irrelevant, *id.* § 3730(e)(4)(A). *See Graham County*, slip op. at 20 (noting that even under the Court's broader reading of the FCA's jurisdictional bar the rights of "original source" *qui tam* plaintiffs are preserved). But the facts of this case belie the assertion that individuals who are not original sources and who obtain information through FOIA requests will generally not be persons with firsthand knowledge of fraud but rather will be opportunistic litigators. *See Ondis*, 587 F.3d at 56. The facts also illustrate how an overbroad reading of the jurisdictional bar would prevent an individual with independent but partial knowledge of a possible fraud would be barred from bringing a lawsuit that is neither parasitic nor frivolous. Here, Kirk became suspicious, based on his own experience as a Vietnam veteran employed by Schindler, that Schindler was not in compliance with VEVRAA. To confirm this suspicion, however, he needed copies of Schindler's VETS-100 reports, and the readiest lawful means through which he could obtain them was a FOIA request. Once he had received copies of the existing reports, and learned that no reports had been filed for certain years, he was able to put the pieces of his lawsuit together. The assumption that such a case will be a rare exception is questionable.

Finally, we note that our interpretation of § 3730(e)(4)(A) accords with that urged by the government as amicus curiae. The government states that the "more limited" jurisdictional bar enacted in 1986 is "predicated upon the public disclosure of allegations in specific categories demonstrating that the government is either actively investigating the alleged fraud or that there is sufficient public awareness of the allegations to pressure the government to start an investigation." Brief for *Amicus Curiae* the United States of America in Support of Appellant at 24-25. In other words, the government advocates an interpretation of the statute under which citizen relators will be able to bring suit in those instances in which the government itself is not

23

pursuing, or considering the pursuit of, an investigation.[9] *See Findley*, 105 F.3d at 688 (finding

that a *qui tam* action was barred where the complaint was based on publicly disclosed

information that "already enable[d] the government to adequately investigate the case and to

make a decision whether to prosecute"); *Springfield Terminal Ry.*, 14 F.3d at 655 (finding that

the FCA's jurisdictional bar is best understood as applying when the government is already, or

can reasonably be expected to be, "on the trail" of fraud); *see also United States ex rel. Fine v.

Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995) (quoting *Springfield Terminal Railway*). While

the "public disclosure" standard that Congress enacted is distinct from an actual notice standard,

*see Graham County*, slip op. at 19 (noting that "[t]he statutory touchstone . . . is whether the

allegations of fraud have been 'publicly disclosed,' not whether they have landed on the desk of a

DOJ lawyer" (brackets and citation omitted)), we note that the forms of public disclosure that

trigger the jurisdictional bar are all forms that can reasonably be expected to indicate that some

branch of government has turned its attention to the potential fraud in question, such as a hearing,

audit, report, or investigation. Under this reading, *qui tam* relators would not duplicate

government efforts to crack down on fraud but would bring their own resources to bear where the

---

[9] We note that the FCA's provisions specifying that *qui tam* suits be filed under seal and that the government be allowed the opportunity to intervene and pursue the action itself, as well as to move for an extension of time during which the complaint remains under seal, to move to dismiss the action, or to settle the action, 31 U.S.C. § 3730(b)-(c), protect the government's ability to maintain control of cases in which it is pursuing an investigation or otherwise wishes to assert its own interests against those of the *qui tam* relator. In one sense the jurisdictional bar, as we interpret it, serves a similar purpose, in that it prevents *qui tam* actions where the government has initiated an investigation of its own. However, the provisions also address different situations, as the intervention provisions allow the government a measure of control over a *qui tam* suit based on allegations that have not been made public in any way, while the jurisdictional bar saves the government the trouble of intervening in a parasitic case based on public allegations.

government was not in a position to act. This division of labor will maximize efficient enforcement of the FCA in the manner envisioned by the authors of the 1986 amendments. *See* S. Rep. No. 99-345, at 2, *as reprinted in* 1986 U.S.C.C.A.N. at 5267 ("In the face of sophisticated and widespread fraud, the Committee believes only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds.").

For all of the foregoing reasons, we hold that a document obtained in response to a FOIA request qualifies as an enumerated source under 31 U.S.C. § 3730(e)(4)(A) only when the document itself is a "congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation," reflecting the government's efforts to compile or synthesize information to serve its own investigative or analytic ends. The mere fact that a government agency has assembled and duplicated records, or noted the absence of records, in responding to a FOIA request does not itself render the material produced an "administrative . . . report . . . or investigation" within the meaning of § 3730(e)(4)(A).

In this case, the materials produced to the Kirks by the DOL in response to Mrs. Kirk's FOIA requests consisted only of Schindler's VETS-100 filings as well as letters indicating that for certain years no responsive records had been found, neither of which constitutes an "administrative . . . report . . . or investigation" under the statute. Accordingly, the materials are not enumerated sources, and the FCA's jurisdictional bar does not apply.[10]

---

[10] Because we find that the FOIA materials are not enumerated sources, the parties' dispute over whether the "allegations or transactions" requirement of § 3730(e)(4)(A) is satisfied is moot. Similarly, we need not address the question of whether Kirk qualifies as an "original source" of the information within the meaning of § 3730(e)(4)(A).

For the first time on appeal, Schindler raises the additional argument that the information on which Kirk's claims are based was publicly disclosed because the DOL is required by law to "make available in a database a list of the contractors that have complied with [VEVRAA's

## II. The Validity of Kirk's Claims Under the FCA

We next address whether Kirk stated valid claims under the FCA when he alleged that (1) Schindler did not file, or did not timely file, any VETS-100 reports for the years 1998 through 2003, and (2) Schindler filed false VETS-100 reports for 2002,[11] 2004, 2005, and 2006.[12] We review *de novo* a district court's decision to dismiss a plaintiff's claims for failure to state a claim. *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001). In doing so, we accept as true all factual allegations contained in the complaint and draw all inferences in favor of the plaintiff. *Id.*

As an initial matter, the parties each make arguments that we either should not or need not reach this issue. Schindler argues, for the first time on appeal, that the provisions of VEVRAA on which Kirk relies are not applicable to its contracts with the government because the applicable regulations exempt "contracts for commercial items" from the requirement of filing VETS-100 reports. *See* 48 C.F.R. § 22.1302(b) (exempting "contracts for commercial

---

requirement that VETS-100 reports be filed]," 31 U.S.C. § 1354(b). However, "[i]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005) (quoting *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994). While we have discretion to consider waived arguments in order to avoid a manifest injustice or where a question of law is at issue and there is no need for additional factfinding, *id.*, this is not an instance in which it would be appropriate to exercise that discretion. Kirk contends that the database is not available to the public but rather is password-protected and available only to certain agency officials. Given that there is nothing in the record indicating what the nature of this database is or to whom it is available, we are not in a position to evaluate Schindler's argument.

[11] As noted above, Kirk's complaint alleges that Schindler failed to file a VETS-100 report for 2002 by the applicable deadline, and it also alleges that Schindler's VETS-100 report was false. We assume for the purposes of this analysis that both allegations are potentially true, and simply address the legal validity of each theory of liability.

[12] On appeal, Kirk does not pursue his claims based on Schindler's alleged failure to implement an affirmative action plan for veterans and to offer veterans an opportunity to self-identify.

26

items" from filing VETS-100 reports and other VEVRAA filing requirements); 66 Fed. Reg. 53,487, 53,487 (Oct. 22, 2001) (noting that 31 U.S.C. § 1354, which prohibits the government from entering into contracts with contractors who have not filed their VETS-100 reports, does not apply to "acquisitions of commercial items"). Because this argument was not raised before the district court, however, it is waived. *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005). We further observe that the question of whether Schindler's contracts to install and maintain elevators and escalators are properly considered "contracts for commercial items" rather than contracts for construction, which are not exempted from the VETS-100 filing requirements, is fact-specific and therefore does not present an appropriate occasion for us to exercise our discretion to consider an argument that has been waived. *See id.*

Kirk, for his part, argues that it was improper for the district court to consider the substantive validity of his FCA claims because Schindler did not move to dismiss these claims under Fed. R. Civ. P. 12(b)(6) and asserted instead that the action should be dismissed on jurisdictional and Rule 9(b) grounds. Kirk characterizes the district court's dismissal of certain of his claims as a *sua sponte* dismissal for failure to state a claim on which relief can be granted, and asks that, if we do not reinstate his dismissed claims on substantive grounds, we vacate this aspect of the district court's decision in order to afford him an opportunity to be heard. It is true that "[p]roviding a plaintiff with notice and an opportunity to be heard is often necessary to establish the fairness and reliability of a dismissal," *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007), and failure to afford plaintiff an opportunity to be heard can be grounds for reversal, *see Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347, 1365 (2d Cir. 1985). Because, for the reasons explained below, we reverse the district court's determination that

27

certain of Kirk's claims were substantively invalid and reinstate those claims, however, we need not address this alternative argument. We therefore draw no conclusions as to whether the district court's dismissal is properly characterized as *sua sponte* or whether it is in fact the case that Kirk did not receive a meaningful opportunity to be heard below.

Turning, then, to the validity of Kirk's claims, we first review the elements of liability under the FCA. At the time Kirk filed his claim, the potentially applicable provisions of the FCA were 31 U.S.C. § 3729(a)(1)[13] and (a)(2).[14] In 2009, Congress passed the Fraud Enforcement and Recovery Act ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009), which amended and renumbered these provisions as §§ 3729(a)(1)(A) and (a)(1)(B), respectively, *see* FERA § 4(a), 123 Stat. at 1621. The amendment to § 3729(a)(2), but not the amendment to § 3729(a)(1), was made retroactive to June 7, 2008, applicable to "all claims under the False Claims Act . . . that [were] pending on or after that date," FERA § 4(f), 123 Stat. at 1625. Because Kirk's claim was filed in March 2005, and was pending as of June 7, 2008, the potentially applicable provisions in this case are former § 3729(a)(1), establishing liability for "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," and current § 3729(a)(1)(B), establishing liability for "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement

---

[13] This provision imposed liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2006), *amended by* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009).

[14] This provision imposed liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (2006), *amended by* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009).

material to a false or fraudulent claim," *see* FERA § 4(a), 123 Stat. at 1621.

We first address Kirk's claims based on Schindler's alleged failure to file VETS-100 reports for the years 1998 through 2003. We will begin our analysis, as the district court did, with an assessment of whether liability arises under former § 3729(a)(1), employing the analysis set forth in *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001). As we construed former § 3729(a)(1) in *Mikes*, in order to establish liability a plaintiff must show "that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Id.* at 695. The central dispute with regard to Kirk's claims based on Schindler's failure to file VETS-100 reports is whether its subsequent claims for payment were "false" within the meaning of the statute, as construed by *Mikes*.[15] In some cases, a claim made to the government is "factually false," meaning that a contractor supplies "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided," *id.* at 697 — in other words, the contractor bills for something it did not provide. In such a case, application of the FCA is fairly straightforward. More difficult to assess, however, are cases in which a contractor falsely represents that it is in compliance with a particular federal statute or regulation or an applicable contractual term. *See*

---

[15] Schindler makes much of the materiality requirement contained in current § 3729(a)(1)(B). As we have explained, however, former § 3729(a)(1) is equally applicable to Kirk's claims. While, prior to the adoption of the new provision, the First, Fourth, Fifth, Sixth, Eighth, and Ninth Circuits had all held that the FCA includes a materiality requirement, *see United States v. Bourseau*, 531 F.3d 1159, 1170-71 (9th Cir. 2008) (listing Circuits that have adopted a materiality requirement and similarly adopting one), this Court has never so held, *see Mikes*, 274 F.3d at 697 (noting that some Circuits have adopted a materiality requirement but refraining from deciding whether "a false statement or claim must be material to the government's funding decision"). Rather, *Mikes* focused on the question of when a claim for payment may be construed as "false" under former § 3729(a)(1). *See id.* at 696. Its analysis remains applicable to claims under that provision.

*id.* at 696. Because "[t]he language of [the FCA] plainly links the wrongful activity to the government's decision to pay," *id.*, the statute "does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions," *id.* at 697. In other words, not every instance in which a false representation of compliance with a regulatory regime is made will lead to liability.

*Mikes* extensively addressed the "legally false certification theory" of liability under the FCA, as distinct from a "factually false" claim. *Id.* at 696-97. Legally false certification occurs "where a party certifies compliance with a statute or regulation as a condition to governmental payment." *Id.* at 697. In some cases, there will be an "express false certification," where "a claim . . . falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Id.* at 698. In other cases, however, where no express certification is required, there may still be liability under an "implied certification theory":

> implied false certification is appropriately applied . . . when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid. . . . Liability under the Act may properly be found therefore when a defendant submits a claim for [payment] while knowing . . . that payment expressly is precluded because of some noncompliance by the defendant.

*Id.* at 700. In other words, the contractor itself need not certify compliance for a legally false certification to have occurred, although when it does so there will be an *express* false certification. An *implied* false certification takes place where a statute expressly conditions payment on compliance with a given statute or regulation, and the contractor, while failing to comply with the statute or regulation (and while knowing that compliance is required), submits a claim for payment.

Title 31, Section 1354(a)(1) of the United States Code provides that "no agency may obligate or expend funds appropriated for the agency for a fiscal year to enter into a contract [covered by VEVRAA] with a contractor from which a [VETS-100] report was required . . . with respect to the preceding fiscal year if such contractor did not submit such report." In addition, 48 C.F.R. § 52.222-38 provides that "[b]y submission of its offer, the offeror represents that, if it is subject to the reporting requirements of [VEVRAA], it has submitted the most recent VETS-100 Report required by that [Act]." This regulation was adopted in October 2001 and became effective December 21, 2001. *See* 66 Fed. Reg. 53,487 (Oct. 22, 2001). The district court found that Kirk stated a valid claim under the FCA when he alleged that Schindler submitted bids covered by 48 C.F.R. § 52.222-38 without having submitted a VETS-100 report for the preceding fiscal year and then won a contract. We agree. The effect of the regulation is that any contractor covered by VEVRAA certifies that it has submitted its most recent VETS-100 report when it makes a bid for government business. If it has not submitted the report, such a certification would be false. In the terms of the *Mikes* analysis, then, such a contractor would have made an express false certification (albeit by operation of the regulation rather than by making the certification directly).

The district court also, however, dismissed those of Kirk's claims based on contracts awarded before the regulation's effective date, implicitly holding that liability cannot be predicated on 31 U.S.C. § 1354(a) alone. We respectfully disagree with this aspect of the district court's holding. As *Mikes* explained, implied false certification takes place "when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid" and the defendant, while not in compliance, submits a claim for payment. 274

F.3d at 700. Our discussion, in *Mikes*, of a provision of the Medicare statute offers a useful illustration:

> Section 1395y(a)(1)(A) of the Medicare statute states that "no payment may be made under the Medicare statute for any expenses incurred for items or services which . . . are not *reasonable and necessary* for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A) (emphasis added). Because this section contains an express condition of payment — that is, "no payment may be made" — it explicitly links each Medicare *payment* to the requirement that the particular item or service be "reasonable and necessary." . . . Since § 1395y(a)(1)(A) *expressly* prohibits payment if a provider fails to comply with its terms, defendants' submission of the claim forms implicitly certifies compliance with its provision.

*Id.* at 700-01 (brackets omitted). Similarly, 31 U.S.C. § 1354(a)(1) provides that "no agency may obligate or expend funds" to enter a contract covered by VEVRAA when the contractor has not submitted the requisite VETS-100 report. Because the statute expressly states that the contractor must have submitted the report in order to be paid, a contractor that requests payment under such a contract "implicitly certifies compliance" with the VETS-100 reporting requirement. Kirk therefore states a valid claim under the FCA when he alleges that Schindler submitted bids and won contracts without having filed the requisite report, even before 48 C.F.R. § 52.222-38 became effective.

Next, we address the validity of Kirk's claims based on Schindler's filing of allegedly false VETS-100 reports. Here, the district court, relying on former §§ 3729(a)(1) and (2) as construed by *Mikes*, found that there could be no liability for filing allegedly false VETS-100 reports because none of the applicable statutes or regulations makes filing an *accurate* report a precondition to payment or provides that a contractor, by submitting a bid or a request for payment, certifies the *accuracy*, as opposed to the submission, of its reports. We need not determine whether this analysis is correct, however, because we find that Kirk states a valid

32

claim under the new § 3729(a)(1)(B).[16]

The new provision establishes liability when a party "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Accepting as true all of the factual allegations set forth in the complaint and drawing all inferences in the light most favorable to plaintiff, *see Gregory* 243 F.3d at 691, in 2002, 2004, 2005, and 2006 Schindler filed false VETS-100 reports, necessarily knowing that they were false because Schindler in fact had no mechanism in place to identify covered veterans. It did so in order to procure contracts or obtain payment under existing contracts, as it could do neither without filing the reports. *See* 31 U.S.C. § 1354(a)(1); 48 C.F.R. § 52.222-38. Accordingly, it knowingly used a false record in order to obtain payment from the government. *See* S. Rep. No. 99-345 at 9, *as reprinted in* 1986 U.S.C.C.A.N. at 5274 ("[A] false claim may take many forms, [including] a claim for goods or services . . . provided in violation of contract terms, specification, statute, or regulation. . . . [C]laims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program.")

Schindler argues that the materiality requirement of § 3729(a)(1)(B) is not met here. It notes that the government does not require, before entering into a contract or making payment under an existing contract, that some threshold number of Vietnam veterans be employed by any given contractor. Because the government's funding decisions are not predicated on the content of the reports, Schindler reasons, the allegedly false statements in the reports were not "material"

---

[16] We note that amicus curiae the United States takes the position that "the plain language of the FCA establishes that, where a contractor knowingly submits a false report to the government in order to obtain contracts (and payments on those contracts), no statute or regulation has to separately require that the report be accurate" for liability to attach. Brief for *Amicus Curiae* the United States of America in Support of Appellant at 29.

as defined by § 3729(b)(4) — *i.e.*, "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Schindler maintains that it does not take the position that the government is entirely indifferent to the accuracy of VETS-100 reports; rather, Congress simply did not contemplate using the FCA to ensure the accuracy of the reports. Instead, according to Schindler, their accuracy is best monitored through existing administrative mechanisms.[17]

We are not persuaded by Schindler's arguments. While it is clear that the statute imposes a materiality requirement, we find that that requirement is met under the circumstances alleged in the complaint. Kirk does not merely allege that Schindler filed inaccurate reports, he alleges that Schindler failed to take any steps whatsoever to monitor the number of covered veterans in its workforce and instead fabricated the numbers it supplied in its VETS-100 reports, essentially plucking them out of thin air.[18] We need not now define the precise contours of the materiality

---

[17] Presumably Schindler has in mind such measures as oversight by the OFCCP. *See* 41 C.F.R. § 60-250.60 (providing that the OFCCP conduct compliance evaluations to determine whether contractors are complying with their obligations under VEVRAA, including their obligation to file VETS-100 reports).

[18] Indeed, reports prepared in the manner alleged by Kirk are arguably not VETS-100 reports at all within the definition set forth in VEVRAA. VEVRAA requires that contractors submit reports detailing

> (A) the number of employees in the workforce of such contractor, by job category and hiring location, and the number of such employees, by job category and hiring location, who are qualified covered veterans;
>
> (B) the total number of new employees hired by the contractor during the period covered by the report and the number of such employees who are qualified covered veterans; and
>
> (C) the maximum number and the minimum number of employees of such contractor during the period covered by the report.

requirement in order to hold that in such a case, the VETS-100 reports constitute "false . . . statement[s] material to a false . . . claim." 31 U.S.C. § 3729(a)(1)(B). The reporting requirements of VEVRAA are sufficiently important to Congress that it made fulfillment of them a precondition to payment. *See id.* § 1354(a)(1). Schindler allegedly submitted VETS-100 reports that gave the impression that it was complying with these requirements while in fact it was entirely disregarding them. Such a false statement would certainly have a tendency to "influence, or be capable of influencing, the payment or receipt of money or property."[19] *Id.* § 3729(b)(4).[20] *Cf. United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 575 F.3d 458, 470 (5th Cir. 2009) (construing the materiality requirement, as defined in § 3739(b)(4), as "requir[ing] only that the false or fraudulent statements either (1) make the government prone to a particular impression, thereby producing some sort of effect, or (2) have the ability to [a]ffect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants"). Kirk's FCA claims based on Schindler's filing of allegedly false reports are thus

---

38 U.S.C. § 4212(d)(1). In turn, 31 U.S.C. § 1354(a) provides that no payment can be made to a contractor "from which a report was required under section 4212(d) of [title 38] with respect to the preceding fiscal year if such contractor did not submit such report." A contractor that has submitted a report containing entirely fabricated numbers has arguably not submitted "such report" within the meaning of 31 U.S.C. § 1354(a).

[19] A mere misreporting of the relevant figures from a company that had taken some imperfect measures to ascertain the number of veterans in its workforce, on the other hand, might not fulfill the materiality requirement of § 3729(a)(1)(B).

[20] Kirk further asks us to decide in his favor the two issues that were not reached by the district court but that Schindler raised in its motion to dismiss: whether he pleaded his claims with sufficient particularity under Fed. R. Civ. P. 9(b), and whether the district court should dismiss the case under the doctrine of "primary jurisdiction." However, "[i]n general, we refrain from analyzing issues not decided below." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 90 (2d Cir. 2004). Although we have discretion to reach such issues where the circumstances favor so doing, *id.*, we do not find that such circumstances exist here.

valid.

## CONCLUSION

We have considered the other arguments made by Schindler and find them to be without merit.  We hold that whether documents produced in response to a FOIA request are enumerated sources under 31 U.S.C. § 3730(e)(4)(A) is to be determined by assessing the nature of the documents themselves; they are not "administrative . . . report[s] . . . or investigation[s]" simply by virtue of having been gathered by an agency responding to a FOIA request.  We further hold that Kirk stated valid claims under the FCA when he asserted (1) that Schindler had failed to file VETS-100 reports in certain years, and (2) that Schindler had filed false VETS-100 reports in certain years because it had filed reports that purported to detail the number of covered veterans in its workforce while in fact the company no measures to identify such veterans.  We therefore **VACATE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.